[No. S023421. Feb. 23, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
JERRY THOMAS BUNYARD, Defendant and Appellant.

## COUNSEL

George L. Schraer, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Eric L. Christoffersen, Jane N. Kirkland and Robert Nash, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**MORENO, J.**—Defendant Jerry Thomas Bunyard was convicted by jury of the first degree murders (Pen. Code, § 187)[1] of his wife Elaine Bunyard and of Elaine's full-term, healthy fetus. The jury also found true one special circumstance allegation: that defendant had committed multiple murders (§ 190.2, subd. (a)(3)). Defendant was sentenced to death.

We affirmed defendant's judgment of guilt for first degree murder and upheld the special circumstance finding, but we reversed the penalty judgment because the trial court had improperly given the so-called Briggs Instruction informing the jury that the Governor is empowered to commute a sentence of life imprisonment without possibility of parole, an error we first identified in *People v. Ramos* (1984) 37 Cal.3d 136, 150–159 [207 Cal.Rptr. 800, 689 P.2d 430]. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1242–1245 [249 Cal.Rptr. 71, 756 P.2d 795] (*Bunyard*).) The prosecution elected to retry the penalty phase, and the jury again returned a verdict of death. The trial court sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

### I. Statement of Facts

The facts of the crime, quoted from our previous opinion (*Bunyard, supra,* 45 Cal.3d at pp. 1200–1203), are as follows: On November 1, 1979, Elaine, a pregnant woman ready to give birth any day, was discovered dead in the garage of her home by her seven-year-old daughter, Tanya. Medical testimony at trial established that Elaine had died from a massive shotgun wound to the head, and that her full-term fetus had suffocated moments later from the resulting lack of oxygen. The evidence was uncontroverted that Elaine was killed by Earlin Popham, a childhood friend of defendant. Popham testified at trial that he was hired by defendant to kill Elaine.[2] In summary, Popham's testimony was as follows:

Earlin Popham, also known as Earlin Laudeman, was a drifter, small-time criminal, and frequent drug user who had known defendant since grade school. Around October 1979, two or three weeks before the murders, Popham learned that defendant wanted to see him, and he met with defendant at the Bunyard home. Defendant advised Popham that he had a job for Popham: assisting with a building project in Patterson. Popham accepted the job and began living at the Bunyard residence intermittently.

---

[1] All statutory references are to this code unless otherwise indicated.

[2] Prior to trial, Popham pleaded guilty to the first degree murder of Elaine, and testified for the People in exchange for a prison sentence of 25 years to life.

During this time, Popham and defendant began to discuss defendant's marital situation, and defendant asked Popham if he would kill Elaine for a fee. Defendant gave numerous reasons for his request: Elaine was pregnant by another man; he had offered Elaine $50,000 in settlement for a divorce, but she had refused; in a contested divorce Elaine would take everything defendant had; and that he wanted to be with or marry his new girlfriend, Sarah Pender, who was wealthy or had a wealthy father. Defendant offered to pay Popham $1,000 within a week after the killing, followed by payment of additional money when defendant received the proceeds of an insurance policy. Defendant additionally offered to employ Popham as a caretaker of his ranch after Elaine's murder, and told Popham that he would be welcome to move to Arkansas with defendant, defendant's father, and defendant's girlfriend, Sarah Pender.

While at first Popham declined defendant's offer, when defendant persisted Popham, being sympathetic to defendant's situation and in need of money, eventually agreed to kill Elaine, knowing that she was pregnant. This agreement was reached about one week before the murders occurred.

Popham testified that defendant's plan was to make the murder look like a suicide. Popham was to knock Elaine out in the kitchen, drag her into the garage where defendant had hidden his pump shotgun, and then stage a "shooting" suicide. Defendant believed this plan would be successful due to Elaine's "mental problems" during her pregnancy. Additionally, defendant told his father, Clarence, who lived next door, to go fishing and not be at home during the week when defendant was asking Popham to carry out the murder plan. The date was left up to Popham, but defendant repeatedly asked Popham if today would be the day, including on October 31, the day before the murders.

Finally, on the morning of November 1, when defendant asked if Popham would carry out the plan that day, Popham replied "probably." Waiting until after defendant and Tanya left the house, Popham walked up behind Elaine while she was in the kitchen washing dishes and struck her repeatedly on the head with frying pans to knock her out. He then dragged her while unconscious to the garage, placed her in a chair, propped defendant's shotgun under Elaine's chin, and pulled the trigger, blowing off half her head and face. Realizing that a trail of blood from the kitchen to the garage, and signs of a struggle in the kitchen—including two shattered pans—would not look like a suicide, Popham decided to make it appear to be a robbery by knocking over some furniture, and taking $5 from Elaine's purse.

Popham then drove to the construction project where defendant was working, and talked with defendant in hushed tones for a few minutes. He informed defendant that "it was done," and that he would meet him in town at the A & W at noon. That meeting was held at the appointed time and place, with Popham telling defendant that Elaine had been killed but that "it ain't going to look like a suicide." When Popham said he needed some money, defendant withdrew $175 from his bank and gave $125 to Popham. Popham told defendant that he would call defendant within a week regarding further payments. Two days after the murder, Popham tried to contact defendant by calling the house of defendant's father, Clarence Bunyard, who informed Popham that his son was at his (defendant's) home. Popham then reached defendant by phone at his own home. Although defendant asked Popham to call him at his father's house later that night, Popham did not call again. Telephone records at trial confirmed that a short call had been placed from a residence in San Jose, where Popham was staying, to defendant's home two days after the murders.

Other witnesses at trial, including defendant, testified that in the afternoon of November 1—the date of the murders—defendant went to the Tracton Bar after work and drank heavily. Thereafter, defendant visited Sarah Pender, arriving at her home around 6:40 p.m., in an intoxicated condition. There, he was advised by both his mother and Sarah Pender of the death of his wife.

Testimony at trial established that Elaine had been murdered. Suicide was ruled out because Elaine's arms were too short to have put the barrel of the shotgun under her chin and still have pulled the trigger, and Popham's fingerprints were found on the shotgun. The physician who examined Elaine two days before her death stated [that the fetus she was carrying] had a fetal heartbeat of 140, was due between November 1 and 7, and was normal. The pathologist testified that the fetus was a normal, healthy term infant which weighed eight pounds, two ounces, was in proper position for delivery, and would have been born any day.

On November 2, 1979, one day after the murders, news of Elaine's "suicide" became public. Randy Johnson immediately contacted police authorities. He testified that, although not acquainted with Popham, he (Johnson) had also been asked repeatedly by defendant to kill Elaine. Johnson testified that early in his five-year friendship with defendant, defendant had asked him five to ten times to kill Elaine and Tanya, then later Elaine alone; that defendant made twenty such requests during the first year of their friendship and even raised the offer from $1,000 to $5,000 to $10,000, but Johnson always declined. Later, when Johnson moved in with the Bunyards in the spring of 1979, receiving room and board in return for help with the ranch, the offers continued. Even after Johnson left the Bunyard residence,

the offers continued, for a fee as high as $20,000, but Johnson never acquiesced. Although Johnson never apprised Elaine of her danger, he did mention it to the police prior to the actual murders, as well as to both his sister, Deanna Johnson, and his half brother.

Defendant testified on his own behalf at the guilt phase but did not challenge Popham's testimony that he (Popham) had murdered Elaine and her full-term fetus. Defendant presented an alibi defense and denied any involvement in the murders. Although defendant also denied desiring to divorce his wife, he admitted to striking her on occasion and to carrying on an affair with Sarah Pender, who he testified was his mistress. The defense at trial consisted primarily of an attack on the credibility of Johnson and Popham; defense counsel argued that Popham was lying to save himself from receiving the death penalty. Defendant denied ever soliciting either Johnson or Popham to kill anyone. Defendant further testified that he could think of no reason why Popham killed his wife.

At the penalty phase, the prosecution submitted its case on the basis of the guilt phase evidence. The defense presented one witness, Nathan Eli, who had been sentenced to death twice, twenty years earlier, but had been released from prison and was then employed as an office manager in a San Francisco law firm. The thrust of his testimony was that "lifers" make good prisoners. [End of quotation from prior opinion.] Defendant was sentenced to death.

As noted, we reversed the penalty phase because of *Ramos* error. (*Bunyard, supra*, 45 Cal.3d at pp. 1242–1245.) The People elected to retry defendant. At the penalty phase retrial, Popham testified as to his and defendant's role in the murders, as he had during the guilt phase of the first trial. Randy Johnson was deemed unavailable to testify for reasons explained below, and his testimony from the first trial about defendant's attempt to solicit him to murder Elaine was read to the jury. Other evidence was introduced about the murders. The prosecution also introduced testimony that defendant had engaged in a number of acts of domestic violence against Elaine and against his first wife, Glenna Day.

Defendant's primary defense was to contest his guilt for the murders. Defendant himself testified to deny any involvement and also to describe his military service, which included a tour of duty in Vietnam. Two men who were in San Joaquin County Jail at the time Popham was in jail for the murders testified that Popham had told them he had stolen drugs from a friend and killed his pregnant wife, without mentioning defendant's solicitation of the murders.

On cross-examination of defendant and on rebuttal, the prosecution brought to light that defendant had had a checkered career in the military,

including four AWOL's and three summary courts-martial. Also in rebuttal, the prosecution produced other evidence intended to show defendant had in fact committed the murders of which he had been convicted. Sergeant Harold Johnsen of the San Joaquin County Sheriff's Office testified that defendant had originally denied that he met Popham at the construction site where defendant was working on the day of the murders or that he had withdrawn money from his bank account for Popham. He further testified that defendant admitted to both those things during an interrogation a week later, although he claimed the money was for construction work Popham had done the previous weekend.

## II. DISCUSSION

### A. *Excusal for Cause of Prospective Juror C.B.*

Defendant contends that Prospective Juror C.B. was improperly excused for cause during voir dire. We disagree.

During voir dire, C.B. made clear her general support for the death penalty. However, she stated that she would have difficulty serving on the penalty phase jury because she had not been part of the jury that had found defendant guilty. In her colloquy with the judge she stated: "what happens if the other 12 people made a mistake and he is innocent. See, that's my problem with this whole situation. If I had listened to him and found the gentleman guilty, then that's a whole different circumstance[]." After explaining her general support for the death penalty, C.B. reiterated her difficulty with being a juror in this particular case. "I'm going to be honest with you. I could do it, but I don't want to be on this jury. I didn't find this man guilty, and I don't want to be sentencing him to life without parole. What happens if he's innocent . . . that's what bothers me . . . . I can't sit in judgment of someone that . . . ." At this point, the court interrupted her and solicited from her the statement that she "could perform" her function as a juror.

The court then allowed the prosecutor and defense counsel to question C.B. In response to defense counsel's inquiry as to whether she could serve on the jury, C.B. stated: "Of course, I'll be able—I may be blond[e], but I'm not that stupid. Yeah, I could be capable of that. But I'm telling you up front it bothers me that I wasn't on the first jury, okay."

The prosecutor moved to challenge for cause, which defense counsel opposed. The trial court granted the motion. In response to defense counsel's argument that C.B. had said "she could function when the Court asked her if she could function," the trial court responded: "I have some real doubts about that. She appears to be very hesitant, very unsure, very positive as a matter of

fact that she could not. And, she's trying to say, I believe, or give the correct responses so that she is not looked upon as, like she says, a dumb blond[e]."

Defendant argues the trial court erred in excusing C.B. for cause. The relevant legal principles are well settled: "In *Wainwright v. Witt* [(1985)] 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], the United States Supreme Court set forth the proper procedures for choosing jurors in capital cases. That case 'requires a trial court to determine "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." [Citation.] "Under *Witt*, therefore, our duty is to 'examine the context surrounding [the juror's] exclusion to determine whether the trial court's decision that [the juror's] beliefs would "substantially impair the performance of [the juror's] duties . . ." was fairly supported by the record.' " [Citations.] [¶] In many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected. Under such circumstances, we defer to the trial court's evaluation of a prospective juror's state of mind, and such evaluation is binding on appellate courts.' " (*People v. Roldan* (2005) 35 Cal.4th 646, 696 [27 Cal.Rptr.3d 360, 110 P.3d 289] (*Roldan*).)

Defendant contends that Prospective Juror C.B.'s reservation about serving on the jury, properly understood, was the reservation that she would have to sentence someone to death notwithstanding the fact that she had some lingering doubt about his innocence, and that the court should have made clear that lingering doubt was properly considered at the penalty phase. But the record reveals that C.B. had a more fundamental objection to the proceeding: she made clear her discomfort at not having been on the jury that found defendant guilty and in expressing that discomfort, she did not focus on the imposition of the death penalty but stated that "I didn't find this man guilty, and I don't want to be sentencing him to *life without parole*." The fact that she expressed a reluctance to serve on a penalty phase jury even if that jury sentenced the defendant to life without parole indicates not a concern with whether lingering doubt could justify a refusal to vote for the death penalty, but rather an objection to participating in any kind of sentencing decision when she had not served on the jury that determined defendant's guilt.

Defendant also argues that C.B. should not have been excused for cause because she, at several points, affirmed her ability and willingness to serve on the penalty phase jury. It is true that the mere expression by a prospective juror that he or she anticipates that a juror's duties will be

difficult is not by itself grounds for discharging a juror. (*People v. Avila* (2006) 38 Cal.4th 491, 530 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) On the other hand, C.B. expressed great reluctance in undertaking her duties under the particular circumstance, and such reluctance, "taken into account with the juror's hesitancy, vocal inflection, and demeanor, can justify a trial court's conclusion regarding the juror's mental state that the juror's views would ' "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " (*Roldan, supra,* 35 Cal.4th at p. 697.) The trial court made a determination, based on its judgment about C.B.'s credibility and demeanor, that her attitude toward serving on the penalty phase jury without having determined defendant's guilt would in fact substantially impair the performance of her duty as a juror in the present case. Under these circumstances, we defer to the trial court's determination. (*Roldan, supra,* 35 Cal.4th at p. 696.)

Defendant further contends that C.B. should not have been disqualified because she expressed support for the death penalty. There is no dispute that C.B. was death qualified in the conventional sense. The reason for her exclusion was not her lack of support for the death penalty but, as discussed, her resistance toward serving on a penalty phase jury when she had not determined guilt. As explained above, the trial court did not abuse its discretion in concluding that her attitude disabled her from serving on this particular jury.

B. *Admission of Randy Johnson's Prior Testimony Due to Unavailability*

Randy Johnson, who corroborated the testimony of Earlin Popham by testifying that defendant had solicited him several times to kill Elaine Bunyard, was determined by the trial court to be unavailable to testify at the second penalty phase trial, and therefore his testimony from the first trial was read to the jury. Defendant claims the trial court erred in determining that Johnson was unavailable and in admitting his earlier testimony, thereby violating state statutory law and his right to confront witnesses under the Sixth Amendment to the United States Constitution. This claim has two parts: (1) the trial court with the prosecution's support erred in releasing Johnson on his own recognizance and, but for the error, Johnson would have been available to testify; (2) the prosecution was insufficiently diligent in trying to locate Johnson when he failed to appear. We disagree there was error or lack of diligence.

The facts are these: As explained, Johnson testified during the first trial that defendant asked him on several occasions to kill Elaine Bunyard but Johnson refused. The prosecution intended to call Johnson as a witness at the penalty

phase retrial, ostensibly for two reasons: (1) to corroborate Popham's testimony that defendant desired his wife's murder and would pay others to carry that out, thereby negating any lingering doubt about defendant's guilt that the second penalty phase jury might have; and (2) to establish that defendant committed an unadjudicated crime involving force or violence pursuant to section 190.3, factor (b), i.e., the attempted solicitation of Johnson to commit murder.

On October 15, 1990, approximately one month before the retrial was to commence, a bench warrant issued for Johnson's arrest after he had failed to appear in response to the People's subpoena. On October 22, 1990, the prosecutor filed a declaration in support of a motion to require Johnson to enter into a written undertaking to appear in court pursuant to section 1332. He stated in the declaration that the written undertaking was necessary because of Johnson's failure to respond to the subpoena or contact the prosecution. On that same day, the trial court signed a warrant for Johnson's arrest, allowing him to be released only if he posted a $10,000 bond. Jury selection proceedings began on November 15, 1990. On December 13, Johnson was arrested on the October 22 warrant. On December 17, 1990, Johnson appeared for a hearing. During the hearing, the prosecutor reminded the court of its October 22 arrest warrant and the setting of bail at $10,000. Before the hearing, the trial court asked defendant's counsel to leave the courtroom, and counsel left after objecting to not being allowed to be present. The trial court also ordered the prosecution to provide counsel with Johnson's current rap sheet, which showed an extensive criminal history.[3]

Johnson told the court that he had not looked at the subpoena and had not contacted the prosecutor. The prosecutor informed the court that Johnson was in custody on the bench warrant in defendant's case but that otherwise there was no reason to hold him in custody. The court asked a sheriff's officer, Sergeant Johnsen, if he was satisfied that he would be able to contact Johnson on a moment's notice or as needed and Sergeant Johnsen said that he was. The court released Johnson on his own recognizance, requiring him to call Sergeant Johnsen every Wednesday, and making clear that if he failed to do so, Johnson would violate the conditions of his release and be subject to immediate arrest, whereupon he would be kept in custody until defendant's trial was completed. Johnson was ordered to return to court on January 23, 1991, at 10:00 a.m. Johnson orally agreed to these conditions and signed a written agreement that he would return on the date specified.

---

[3] At oral argument, counsel suggested that the prosecution had not been forthcoming in informing the trial court about Johnson's prior criminal history within California. The record indicates the contrary, that both the trial court and trial counsel were informed of that history.

The next day, defense counsel informed the court that the State of Washington had issued a warrant for Johnson's arrest. The prosecutor stated that he had not been aware of that bench warrant until after the previous day's hearing. He explained that he had contacted Washington authorities and discovered that Johnson had served time in Washington on a misdemeanor offense but had not yet made restitution, and that the warrant was not for an extraditable offense. The prosecutor acknowledged that at the time Johnson was served a subpoena to appear as a material witness in the present case, he was in county jail, and that his rap sheet indicated that he had a number of previous arrests. Notwithstanding this new information, the trial court reaffirmed its order releasing Johnson on his own recognizance subject to the conditions described above. Defendant objected to the order.[4]

Johnson returned to court on January 23, 1991, and was ordered to return again on February 6. He returned on February 6 and was ordered to return on February 19.

Johnson did not return on February 19. The prosecutor stated that Johnson had shown up late for a February 11 interview and had not shown up for an interview scheduled for February 18. The prosecutor also stated that Sergeant Johnsen's attempts to locate Johnson had been unsuccessful.

On March 1, 1991, the trial court held a hearing on whether Johnson was unavailable for testimony. Sergeant Johnsen and another sheriff's officer testified about various efforts to locate Johnson, which will be described at greater length below. Defendant asked the court to exclude Johnson's prior testimony on the ground that the People had failed to exercise due diligence in locating him. At defendant's request, the court allowed Johnson's FBI and CII (Criminal Investigation and Identification) rap sheets to become part of the record. The FBI rap sheet showed that Johnson had substantial contacts with Oregon and Washington and defendant noted that the police had made no efforts to look for him there. Notwithstanding that fact, the trial court found Johnson unavailable and on March 5, 1991, Johnson's testimony from the first trial was read to the jury.

 Defendant contends that the trial court erred in admitting Johnson's testimony. To evaluate this claim we review basic principles: "The confrontation clauses of both the federal and state Constitutions guarantee a

---

[4] Defendant argues without elaboration that the exclusion of trial counsel from the hearing that resulted in Johnson's release violated his right to due process. Assuming without deciding that there was such a violation, it was rendered harmless beyond a reasonable doubt when trial counsel was able to address the court the following day and to produce new evidence to support his position that Johnson should not be released, and when the trial court reaffirmed its decision after considering such argument and evidence.

criminal defendant the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const. art. I, § 15.) That right is not absolute, however. An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination. Under federal constitutional law, such testimony is admissible if the prosecution shows it made 'a good-faith effort' to obtain the presence of the witness at trial." (*People v. Cromer* (2001) 24 Cal.4th 889, 892 [103 Cal.Rptr.2d 23, 15 P.3d 243] (*Cromer*); see also *Crawford v. Washington* (2004) 541 U.S. 36, 53–54 [158 L.Ed.2d 177, 124 S.Ct. 1354].)

"In California, the exception to the confrontation right for prior recorded testimony is codified in [Evidence Code] section 1291, subdivision (a), which provides: 'Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.' A witness is unavailable if '[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process.' ([Evid. Code,] § 240, subd. (a)(5).) Although section 240 refers to 'reasonable diligence,' this court has often described the evaluation as one involving 'due diligence.' " (*Cromer, supra*, 24 Cal.4th at p. 898.)

As noted, defendant contends the trial court erred in releasing Johnson on his own recognizance, a release that was supported by the People, and consequently erred in concluding he was unavailable to testify. As we have recognized, when the trial court errs in releasing a material witness from custody, which results in the witness becoming unavailable for testimony, and the prosecution supports that release, the prosecution may be held to have not exercised reasonable diligence. (*People v. Louis* (1986) 42 Cal.3d 969, 993 [232 Cal.Rptr. 110, 728 P.2d 180] (*Louis*).)[5]

The decision to detain in custody a material witness involves weighing important competing rights. "Article I, section 10 of the California Constitution guarantees '[w]itnesses may not be unreasonably detained.' This constitutional protection is balanced against ' "[t]he duty [of all citizens] to disclose knowledge of [a] crime . . . ." ' [Citation.] This duty is considered to

---

[5] It could be argued that the erroneous release of a witness on his or her own recognizance is really not a failure of prosecutorial diligence but more accurately trial court error. This would be especially true if the trial court granted the release notwithstanding the prosecutor's opposition. But even if so characterized, it would make no difference for confrontation clause purposes whether the error that led to a material witness being unavailable was attributable to the court or to the prosecution—in either case such error, if proven to be prejudicial, could result in a reversal of a judgment against a defendant.

be ' "so vital that one known to be an innocent may be detained, in the absence of bail, as a material witness. [Citations.]" ' [Citation.] [¶] To enforce this duty, section 1332 allows for the incarceration of a person determined to be a material witness to secure his or her presence at trial. Section 1332 states, '(a) [W]hen the court is satisfied, by proof on oath, that there is good cause to believe that any material witness for the prosecution or defense, whether the witness is an adult or a minor, will not appear and testify unless security is required, at any proceeding in connection with any criminal prosecution . . . the court may order the witness to enter into a written undertaking to the effect that he or she will appear and testify at the time and place ordered by the court or that he or she will forfeit an amount the court deems proper. [¶] (b) If the witness required to enter into an undertaking to appear and testify, either with or without sureties, refuses compliance with the order for that purpose, the court may commit the witness, if an adult, to the custody of the sheriff . . . until the witness complies or is legally discharged.' " (*In re D. W.* (2004) 123 Cal.App.4th 491, 497–498 [20 Cal.Rptr.3d 274].)

" 'The unique posture of the material witness' requires special attention to ensure that the procedures leading to the incarceration of a witness are fair and comply with 'procedural safeguards allowing the interests of the witness to be heard in conjunction with the interests of the state.' " (*In re D. W., supra,* 123 Cal.App.4th at p. 498.) The unjustified deprivation of a material witness's liberty is a violation of the due process clauses of the federal and state Constitutions. (*Ibid.*; see also *In re Francisco M.* (2001) 86 Cal.App.4th 1061, 1071–1072 [103 Cal.Rptr.2d 794] (*Francisco M.*).)

The threshold question is the standard of review that should be employed to determine whether there has been reasonable diligence when a material witness has been released on his or her own recognizance and then becomes unavailable. We have held that "appellate courts should independently review a trial court's determination that the prosecution's failed efforts to locate an absent witness are sufficient to justify an exception to the defendant's constitutionally guaranteed right of confrontation at trial." (*Cromer, supra,* 24 Cal.4th at p. 901.) The question is whether we should employ the same independent review standard to determine whether releasing a material witness on his or her own recognizance constitutes a failure of reasonable diligence.

In *Cromer,* in deciding that independent review rather than abuse of discretion was the proper standard, we relied on (1) the importance of the right at stake, i.e., the Sixth Amendment right to confront witnesses (*Cromer, supra,* 24 Cal.4th at pp. 896–897); (2) the fact that the determination of reasonable diligence "requires application of an objective, constitutionally

based legal test" to certain facts (*id.* at p. 900); and (3) the fact that the trial court does not have a first-person vantage point with respect to the prosecutor's efforts to find the witness, but is in essentially the same position as an appellate court in applying the objective test (*id.* at p. 901). Thus, although the reviewing court will defer to the trial court's determination of the historical facts of what the prosecution did to locate an absent witness, it will independently review whether those efforts amount to reasonable diligence sufficient to sustain a finding of unavailability. (*Id.* at pp. 900–901.)

In the present situation, in which we are reviewing essentially the trial court's own decision to release a witness on his own recognizance, albeit with the prosecution's consent and even urging, the circumstances are markedly different. First, whereas in the case of the prosecution's efforts to obtain the testimony of an absent witness, the defendant's constitutional right of confrontation is the sole constitutional right at stake, the decision to keep a material witness in custody involves balancing that right against the substantial due process right of the witness, who has not been charged with a crime, to not be unreasonably incarcerated. Second, whereas an appellate court is more or less in the same position as a trial court in judging whether the prosecution's efforts to obtain an absent witness are sufficient, the trial court is in a better position than an appellate court to ascertain whether and to what extent a witness is a flight risk, and the appropriate measures to reduce that risk. This determination involves in part an observation of the witness's credibility and demeanor that the trial court is uniquely in a position to make. Therefore, although we conduct independent review in the sense that we independently apply an "objective, constitutionally based legal test" to certain facts (*Cromer, supra,* 24 Cal.4th at p. 900), we also give due deference to the trial court's determination of a witness's flight risk, and will second-guess that determination only when it is clear from the record that it was objectively unreasonable.

In the present case, we conclude the trial court made a reasonable determination that Randy Johnson would appear to testify, and the prosecution's support for the trial court's decision did not constitute a lack of reasonable diligence. After he was arrested for ignoring the subpoena, the court had Johnson agree orally and in writing to return on a specified date, and to keep in weekly contact with Sergeant Johnsen until that date, with the understanding that he would be rearrested and placed in custody if he failed to maintain that weekly contact. The court made a credibility determination that Johnson would return to testify, and Johnson did in fact comply within the reporting requirements for almost two months.

In arguing in support of his position, defendant cites *Louis, supra,* 42 Cal.3d 969. We agree that a comparison of this case to *Louis* is useful—although we

draw a different conclusion—and will therefore render a somewhat detailed account of that case. In *Louis*, the court considered the validity of a guilty verdict in a capital trial. The defendant and four codefendants were tried for several robberies and the murder of a gas station attendant. During the defendant's preliminary hearing, Gregory Tolbert, who was living in an apartment with the sister of one of the codefendants, testified to overhearing a conversation in the apartment among the defendant and the codefendants that the gas station attendant, who had witnessed one of their previous crimes, would have to be killed. (*Id.* at p. 976.) After the murder, according to Tolbert's testimony, the defendant told a codefendant that he "took out" the attendant. (*Id.* at p. 977.) At the preliminary hearing, some substantial questions about Tolbert's credibility emerged, including inconsistent and incriminating statements, as well as an extensive criminal record and the use of a number of aliases. (*Ibid.*)

Tolbert also testified in a separate trial of the codefendants, and they were convicted of the robbery charges, but the jury found one of the codefendants not guilty of the murder charges and was unable to reach a verdict about the other codefendants. (*Louis, supra*, 42 Cal.3d. at pp. 977–978.) Tolbert was in custody on felony charges and, in order to induce him to testify at the first trial of the codefendants, the prosecution had arranged for Tolbert to be released on his own recognizance over the weekend with an unnamed friend at an undisclosed location before appearing for sentencing. (*Ibid.*) Tolbert promptly disappeared.

The retrial of the codefendants for noncapital murder and the trial of the defendant for capital murder were consolidated and conducted before two separate juries. (*Louis, supra*, 42 Cal.3d at p. 978.) Tolbert was deemed unavailable; his preliminary hearing testimony was admitted in the defendant's trial over his objection, and the prior trial testimony was admitted against the defendant and codefendants. (*Id.* at pp. 978, 981.) Tolbert's testimony at the previous trial did not include the statement made at the defendant's preliminary hearing that the defendant had said he " 'took . . . out' " the attendant. (*Id.* at p. 977.) Other than Tolbert's testimony on that point, the case against the defendant and the codefendants was the same, and was quite weak. (*Id.* at pp. 981–982.) The defendant was convicted of first degree murder with special circumstances and was sentenced to death. Two of the codefendants were acquitted on the murder charge and the jury was unable to reach a verdict as to the third, whereupon the trial court declared a mistrial and dismissed the information against that codefendant with prejudice. (*Ibid.*)

The *Louis* court held that the People had been insufficiently diligent in compelling Tolbert to testify at trial. (*Louis, supra*, 42 Cal.3d at

pp. 991–993.) Characterizing Tolbert's testimony as the most important testimony in the defendant's case, this court concluded that the diligence required of the prosecutor "was particularly high. Defendant was to go on trial for his life; Tolbert was a critical prosecution witness, and was known to be both unreliable and of suspect credibility—the very type of witness that requires, but is likely not to appear to submit to, cross-examination before a jury." (*Id.* at p. 991.) In coming to the conclusion that the prosecution had failed to exercise reasonable diligence, the *Louis* court emphasized that at the time the prosecutor arranged to have Tolbert released on his own recognizance, he was in custody on felony charges, and was released as part of a deal in exchange for Tolbert's testimony in the codefendants' first trial. (*Id.* at pp. 991–992.) Indeed, the People conceded that allowing Tolbert to be released prior to his sentencing was risky, but that the risk was worth taking in exchange for his testimony at the earlier trial. As we concluded, the argument that Tolbert's release was needed to secure this testimony at the first codefendants' trial "is immaterial. The purpose of the due diligence requirement is to ensure that the prosecution has made all reasonable efforts to procure the presence of the witness before the defendant is denied the opportunity to confront him. [Citation.] Whether reasonable or not in view of some other purpose, the agreement neither was intended, nor did it operate, to prevent Tolbert's absence from defendant's trial." (*Id.* at p. 992, italics omitted.)

The present case is distinguishable from *Louis* in several respects. Although Johnson, like Tolbert, had an extensive criminal history, Johnson, unlike Tolbert, had no current charges pending against him, other than a nonextraditable failure to pay restitution in Washington, and therefore did not represent an imminent flight risk. In *Louis*, the court made clear that by releasing Tolbert for the weekend despite his known flight risk and the upcoming sentencing, the prosecution had subordinated the goal of producing him at the defendant's trial to the goal of having him testify at the codefendants' trial, and that the fulfillment of this latter goal could not justify the lack of reasonable diligence in meeting the former. In the present case, Johnson's release on his own recognizance was not undertaken in subordination to some other prosecutorial objective, but was an attempt to balance Johnson's liberty interests with defendant's right to confrontation.

Moreover, in *Louis*, Tolbert was being held on another charge and, because he was being released for a weekend before being sentenced, his liberty interest in being released was relatively minor. Johnson's liberty interest was considerably greater. He was being held on no other charge, and the trial court was aware that Johnson's required testimony was at least five weeks (and what proved to be two months) in the future. In light of the fact that Johnson did not represent an imminent flight risk, we cannot say the trial court acted unreasonably under the circumstances in having Johnson sign a

written undertaking to appear, and in taking steps to ensure that Johnson remained in contact with the court and available, nor that the prosecution's support for these measures constituted a lack of reasonable diligence. Those measures worked for at least seven weeks—Johnson twice reported as he was supposed to and maintained weekly contact with Sergeant Johnsen.

This case is also in contrast to *Francisco M., supra,* 86 Cal.App.4th 1061, cited by defendant, in which two juvenile material witnesses were detained and in which the Court of Appeal remanded the case to determine whether continuing detention was proper.[6] Even assuming that the detention in that case ultimately was deemed lawful, it was based in large part on the witnesses' avowed noncooperation—statements that they would not testify and would seek to evade a subpoena. (86 Cal.App.4th at pp. 1067–1069.) In the present case, Johnson promised to cooperate, credibly in the view of the trial court. Although a trial court's credibility determination that a material witness will appear will not be accorded unlimited deference by an appellate court, and a prosecutor's support for a decision to release a witness who poses a substantial flight risk is a significant factor to be considered in evaluating whether the prosecutor has exercised due diligence, in this case the trial court's determination was reasonable.

Defendant also argues that the court was not required to keep Johnson in custody but could have imposed (and the prosecution should have urged the court to impose) on Johnson a written undertaking with security, pursuant to section 1332, subdivision (a), in other words to release the witness on bail, in order to ensure his appearance at trial. Defendant did not raise this argument at trial and it is therefore forfeited on appeal. (See *People v. Halvorsen* (2007) 42 Cal.4th 379, 414 [64 Cal.Rptr.3d 721, 165 P.3d 512].) Although defendant's trial counsel objected to Johnson's "OR release," he never raised the

---

[6] In *Francisco M.,* the court offered several factors to be considered in determining whether or not to detain a material witness. These factors included: (1) the seriousness of the criminal charges; (2) the importance of the witness's testimony; (3) the length of the proposed detention; (4) evidence relevant to whether the witness will appear, including employment, residence and other community ties; (5) the age and maturity of the witness; (6) the harm to the witness's family from incarceration; (7) the witness's financial resources; (8) the likelihood of continuances that will prolong the prosecution; and (9) whether steps short of incarceration are feasible. (*Francisco M., supra,* 86 Cal.App.4th at pp. 1076–1078.)

Defendant argues that most of these factors favored keeping Johnson in prison, specifically the seriousness of the criminal charges, the importance of Johnson's testimony, Johnson's lack of community ties and history of ignoring subpoenas, and the lack of harm to Johnson's family. While the *Francisco M.* factors are no doubt useful guidelines for the exercise of the trial court's discretion to determine whether or not to detain a material witness, or an appellate court's decision whether witnesses should continue to be detained, that case does not suggest that the counting of these factors is a useful means of determining retrospectively whether a trial court abused its discretion in failing to detain a material witness. As discussed, we believe that, in light of the length of the detention and the fact that the witness had no strong incentive to flee, the trial court's decision was reasonable.

alternative of requiring a written undertaking with security. Without raising the issue at trial, we have no way of knowing whether imposing such conditions on Johnson was a feasible alternative to detention on the one hand and OR (own recognizance) release on the other.

Defendant also contends that once Johnson failed to appear, the prosecution was insufficiently diligent in finding him. As noted, we independently review the trial court's determination that the prosecution has been reasonably diligent in seeking an absent witness. (*Cromer, supra*, 24 Cal.4th at p. 901.)

The record reveals that two sheriff's officers testified that they made numerous attempts to locate Johnson, including: repeatedly checking Johnson's last known address, and areas he was known to frequent; putting out a BOLO (be-on-the-lookout-for) bulletin for Johnson; attempting to contact Johnson's brother and sister, who also lived in the county; checking the jails and hospitals of San Joaquin County and the jails of six neighboring counties; repeatedly over a week's time checking the east end of Stockton and other locations where they had information he was likely to be; and checking with Johnson's known associates. Officers also testified that they learned on the evening of February 19, 1991, that several days earlier Johnson had taken, perhaps stolen, a car and had used it to flee from the minimart where he had stolen a beer, and was now attempting to avoid the police.

Defendant made at trial, and makes again on appeal, the argument that the police did not attempt to look for Johnson out of state, in Oregon or Washington, where according to his rap sheets he had been convicted of various crimes. But there was nothing to indicate he had fled to those states; indeed, given that there was a warrant for his arrest in Washington, his flight to that state was not particularly likely.

Our review of the case law shows that in those cases in which courts have not found adequate diligence, the efforts of the prosecutor or defense counsel have been perfunctory or obviously negligent. (See, e.g., *People v. Sanders* (1995) 11 Cal.4th 475, 524 [46 Cal.Rptr.2d 751, 905 P.2d 420] [belated effort to find witness consisted of a single phone call to her former work number and several visits to her former address]; *People v. Avila* (2005) 131 Cal.App.4th 163, 169–170 [31 Cal.Rptr.3d 441] [waiting until the first day of trial to locate a witness at her last known residence without efforts to keep track of her, despite knowing she was a flight risk]; *People v. Pitts* (1990) 223 Cal.App.3d 1547, 1556–1557 [273 Cal.Rptr. 389] [despite witness's criminal record and drug use, investigator confined search for witness in the criminal justice system to a single county and did not search by witness's known

aliases].) On the other hand, diligence has been found when the prosecution's efforts are timely, reasonably extensive and carried out over a reasonable period. (See, e.g., *People v. Cummings* (1993) 4 Cal.4th 1233, 1297 [18 Cal.Rptr.2d 796, 850 P.2d 1] [frequent stops at witness's last known residence over a one-week period, contacting neighbors, employer, and relatives]; *People v. Diaz* (2002) 95 Cal.App.4th 695, 706–707 [115 Cal.Rptr.2d 799] [numerous attempts to find witness defeated by witness's determined effort to avoid testifying]; *People v. Wise* (1994) 25 Cal.App.4th 339, 344 [30 Cal.Rptr.2d 413] [checking several addresses where witness might be found, as well as local jail, hospital, and coroner].) The People's efforts in the present case decidedly resemble the extensive efforts made in the latter group of cases. We therefore conclude that the trial court did not err in determining that the prosecution had been reasonably diligent in attempting to locate Johnson, that the trial court properly deemed him to be unavailable, and that his testimony from the first trial was properly admitted.

### C. *Admission of Testimony of Domestic Violence*

Defendant contends the trial court erred in admitting evidence of domestic violence he inflicted on Elaine and on his former wife, Glenna Day. He contends that admitting this evidence was both state law error, because the evidence was outside the scope of section 190.3, factor (b) or any other statutory aggravating factor, and violated the Eighth Amendment to the United States Constitution because it permitted the judgment of death to be imposed based on conduct that does not warrant such a harsh penalty. We conclude these claims are without merit.

Before trial, the prosecution gave notice of its intent to introduce evidence that defendant had committed several violent acts against Elaine and Glenna Day. Defense counsel objected, but the trial court ruled the evidence admissible under section 190.3, factor (b), "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." At trial, Elaine's daughter, Tanya, testified that Elaine and defendant fought a great deal, that defendant would slap Elaine and that he once threw a plate at her during dinner that missed her. More than once during Elaine's pregnancy, defendant put his hands on Elaine's throat and pushed her into a wall. Defendant grabbed Elaine's shoulders and pushed her into a wall when she came home late and had not fixed defendant's dinner. Earlin Popham and Randy Johnson (the latter through the introduction of his prior testimony) testified they saw defendant strike Elaine several times.

Defendant, in response to questions by the prosecution, testified that he had "probably" slapped his first wife, Glenna Day, and that he had hit her and that he might have grabbed her by the neck and shoved her against a wall. He also admitted hitting Elaine on several occasions. The prosecution highlighted these incidents in its closing argument.

 Section 190.3, factor (b) pertains to violent criminal activity other than the crimes for which a capital defendant is on trial. (*People v. Osband* (1996) 13 Cal.4th 622, 716 [55 Cal.Rptr.2d 26, 919 P.2d 640].) Its purpose is to " 'show the defendant's propensity for violence' " (*People v. Avena* (1996) 13 Cal.4th 394, 426 [53 Cal.Rptr.2d 301, 916 P.2d 1000]), which is pertinent to determining a capital defendant's individual moral culpability. Its language regarding "express or implied threat[s] to use force or violence" (§ 190.3, factor (b)) has a " ' "common-sense core of meaning" ' " that requires no further elucidation in the jury instructions. (*People v. Dunkle* (2005) 36 Cal.4th 861, 922 [32 Cal.Rptr.3d 23, 116 P.3d 494].)

As defendant concedes, section 190.3, factor (b) applies to misdemeanor violent activity as well as felony activity. (See *People v. Phillips* (1985) 41 Cal.3d 29, 71 [222 Cal.Rptr. 127, 711 P.2d 423] [interpreting identically worded provision in 1977 death penalty statute].) Nonetheless, defendant argues that incidents such as hitting or throwing plates are too trivial to be included in a penalty phase determination, and must be outside the scope of what was intended by factor (b). We disagree. Even assuming that factor (b) can be interpreted to exclude certain violent activity as too minor to be within the scope of the evidence to be considered by a jury in arriving at a penalty phase judgment, the present activity would not qualify as part of that exception. The testimony demonstrated a course of conduct of domestic violence that defendant engaged in against both his former wives. The seriousness of each of the acts, i.e., their potential injurious effect, varied, but the course of conduct taken as a whole was relevant to showing " 'defendant's propensity for violence' " (*People v. Avena, supra*, 13 Cal.4th at p. 426), rendering such evidence admissible under factor (b). The proper weight given to such evidence, of course, was for the jury to decide. We therefore conclude neither state law nor constitutional error was committed.[7]

---

[7] Defendant cites two federal cases tried under the federal death penalty statute in which evidence of violent activity was excluded at the penalty phase of the trial for being too minor. (*U.S. v. Gilbert* (D.Mass. 2000) 120 F.Supp.2d 147; *U.S. v. Friend* (E.D.Va. 2000) 92 F.Supp.2d 534.) These cases are distinguishable. Under the federal death penalty statute, a defendant can be sentenced to death for first degree murder only if one of the statutorily enumerated aggravating factors is found by the jury to be present beyond a reasonable doubt, and the jury concludes, considering both statutory and nonstatutory aggravating factors, that these outweigh the mitigating factors. (*Friend, supra*, 92 F.Supp.2d at p. 537; 18 U.S.C. § 3593(d), (e).) A nonstatutory aggravating factor is one that fits within the catchall provision, 18 United States Code section 3593(a)(2), permitting consideration of " 'relevant information' . . . that may tend

### D. Jury Instructions Regarding Aggravating and Mitigating Circumstances

Defendant contends that his Sixth Amendment right to a jury trial and Fourteenth Amendment right to due process were violated because he was sentenced to death without the jury's being instructed that it had to find beyond a reasonable doubt the presence of at least one aggravating factor, and beyond a reasonable doubt that aggravating factors substantially outweighed the mitigating factors. His argument is based upon the line of United States Supreme Court cases generally requiring that sentencing findings increasing the maximum level of punishment be made by a jury. (See *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]; *United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738]; *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]; and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348].) We have repeatedly rejected that contention (see, e.g., *People v. Romero* (2008) 44 Cal.4th 386, 429 [79 Cal.Rptr.3d 334, 187 P.3d 56]) and defendant advances no persuasive argument for reconsidering our conclusion.

Defendant also claims the trial court committed reversible error under the Fourteenth Amendment and other unspecified constitutional provisions by refusing a defense instruction that would have instructed the jury there was no requirement that jurors unanimously agree on mitigating circumstances and that jurors should individually weigh and consider such circumstances. We have held that such instruction is unnecessary and that the standard

---

to make the death penalty more appropriate." (*Gilbert, supra,* 120 F.Supp.2d at p. 150.) Both *Gilbert* and *Friend* involved in part the question of whether certain pieces of evidence introduced during the penalty phase under the rubric of nonstatutory aggravating factors were sufficiently relevant to be considered by a penalty phase jury. In *Gilbert,* the prosecution attempted to introduce evidence of an incident that the defendant, a former nurse, had scalded a mentally retarded boy in a hot bath, and that she had assaulted her husband with a large kitchen knife. The court excluded the evidence because there were substantial questions as to its reliability and because the incidents were not of sufficient gravity, and therefore the heightened Eighth Amendment standard for introducing penalty phase evidence had not been met. (*Gilbert, supra,* 120 F.Supp.2d at p. 153.) In *Friend,* the court concluded that one of the nonstatutory aggravating factors, that the defendant conspired with his brother to kill a potential witness to a murder, should be stricken, when the only evidence to support that factor was an overheard discussion and no evidence showed the defendant followed through with an overt act. (*Friend, supra,* 92 F.Supp.2d at pp. 544–545.)

In the present case, the domestic violence evidence was related to a specific factor under the California statutory scheme. Furthermore, unlike the bad acts in federal cases, the domestic violence that defendant inflicted on multiple occasions on both his former spouses was material and reliable evidence of a propensity for violence that was relevant to the jury's penalty phase determination.

instruction, which was delivered in the present case, was constitutionally sufficient. (*People v. Weaver* (2001) 26 Cal.4th 876, 988 [111 Cal.Rptr.2d 2, 29 P.3d 103].) Defendant also contends the trial court erred in refusing an instruction that the jury was not required to find a mitigating circumstance true beyond a reasonable doubt or by a preponderance of the evidence in order to consider it at the penalty phase. This argument too has been rejected. (*People v. Bonillas* (1989) 48 Cal.3d 757, 789–790 [257 Cal.Rptr. 895, 771 P.2d 844].) We decline to reconsider either issue.

### E. Double Counting of Johnson's Testimony

Defendant claims that Johnson's testimony that defendant had solicited him to murder Elaine was used to support two aggravating factors: both section 190.3, factor (a), the circumstances of the crime and factor (b), prior violent criminal activity. He contends that such double counting amounts to reversible error, violating statutory law, section 190.3, and the Eighth and Fourteenth Amendments to the United States Constitution. We disagree any such error occurred here.

Factors (a) and (b) of section 190.3 refer to distinct, nonoverlapping categories, the former to the circumstances of the present crime that have made the defendant eligible for the death penalty, the latter to other violent criminal activity. (*People v. Visciotti* (1992) 2 Cal.4th 1, 76 [5 Cal.Rptr.2d 495, 825 P.2d 388].) We have suggested that improper prosecutorial argument that invites the jury to consider the same evidence in support of both factors could lead the jury to overemphasize the importance of that evidence, resulting in penalty phase error. (*Ibid.*)

There was no such improper prosecutorial argument in the present case. The prosecutor used the Johnson testimony in connection with only one aggravating factor, section 190.3, factor (b), to prove that defendant had engaged in an unadjudicated violent criminal act in attempting to solicit Johnson to kill Elaine. The prosecutor did not mention the Johnson testimony in connection with factor (a).

It is true that the prosecution argued to the second penalty phase jury, which had not participated in the guilt phase of the trial, that Johnson's testimony should negate any lingering doubt that defendant did in fact commit the murders of which another jury had convicted him. But section 190.3, factor (a) is concerned with those circumstances that make a murder especially aggravated, and therefore make a defendant more culpable and deserving of the ultimate penalty. (See *People v. Jenkins* (2000) 22 Cal.4th

900, 1052–1053 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) While the prosecutor in the present case did use the Johnson testimony to confirm that defendant had committed the murders, he did not suggest defendant's unsuccessful solicitation of Johnson to murder Elaine made her murder more aggravated under factor (a). Therefore, such dual use of the Johnson testimony did not amount to double counting of that testimony to support two separate aggravating factors.

### F. *Various Constitutional Challenges to the Death Penalty Statute.*

Defendant contends that the death penalty statute, as construed by this court and applied at defendant's trial, is unconstitutional in a number of respects. First, defendant contends that the special circumstances that render a defendant eligible for the death penalty are so numerous and so broadly interpreted that they do not sufficiently narrow the class of defendants eligible for the death penalty in violation of the Eighth and Fourteenth Amendments to the United States Constitution. We have rejected that argument on a number of occasions (see, e.g., *People v. Carter* (2005) 36 Cal.4th 1215, 1278 [32 Cal.Rptr.3d 838, 117 P.3d 544]) and continue to do so here.

Defendant argues that section 190.3, factor (a), as construed by this court, is overbroad and vague, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. In support of the argument, he cites instances in which prosecutors in different cases have argued that seemingly contradictory circumstances of the crime were aggravating, for example that defendant struck many blows inflicting multiple wounds, and that defendant killed the victim with a single execution-style wound. As we stated in *People v. Jenkins, supra*, 22 Cal.4th at page 1053: "The ability of prosecutors in a broad range of cases to rely upon apparently contrary circumstances of crimes in various cases does not establish that a jury in a particular case acted arbitrarily and capriciously. As with the factor of the defendant's age, the adversary process permits the defense, as well as the prosecution, to urge the significance of the facts of the charged crime. Defendant fails to persuade us that these circumstances deprive him of due process of law." (Italics omitted.)

Defendant also makes a number of claims similar to those rejected above in connection with the claims of erroneous jury instructions. We continue to reject the contention that the Eighth and Fourteenth Amendments to the United States Constitution require that the jury find unanimously beyond a reasonable doubt the existence of at least one aggravating factor, or that the aggravating factors outweigh the mitigating factors, or that death is the appropriate penalty. (*People v. Ward* (2005) 36 Cal.4th 186, 221 [30 Cal.Rptr.3d 464, 114 P.3d 717].) Neither proof beyond a reasonable doubt nor

jury unanimity as to the existence of particular sentencing facts is required. (*Ibid.*) This conclusion is not altered by the United States Supreme Court's decision in *Apprendi v. New Jersey, supra,* 530 U.S. 466, and its progeny. (*Ward, supra,* 36 Cal.4th at p. 221.) Nor, as defendant argues, is a preponderance-of-the-evidence burden of proof required at the penalty phase in the event we reject a beyond-a-reasonable-doubt burden of proof. " 'Unlike the guilt determination, "the sentencing function is inherently moral and normative, not factual" [citation] and, hence, not susceptible to a burden-of-proof quantification.' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 589 [36 Cal.Rptr.3d 340, 123 P.3d 614] (*Manriquez*).) Nor does the death penalty statute violate Evidence Code section 520 by failing to place the burden of proof on the party prosecuting the crime or wrongdoing, nor is any constitutional provision violated by the lack of an explicit instruction that there is no burden of proof. (*People v. Dunkle, supra,* 36 Cal.4th at p. 939.) Nor does the Sixth, Eighth, or Fourteenth Amendment require written findings or other specific findings by the jury regarding the aggravating factors. (*Manriquez, supra,* 37 Cal.4th at p. 590.) Nor does the Eighth Amendment require intercase proportionality review. (*Manriquez, supra,* 37 Cal.4th at p. 590.)

Moreover, although the jury in this case was properly instructed that any unadjudicated criminal activity may not be used as an aggravating factor unless a juror is convinced beyond a reasonable doubt that a defendant is guilty of such activity, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution do not require that jurors agree unanimously on each instance of such activity. (*People v. Ward, supra,* 36 Cal.4th at pp. 221–222.) *Apprendi* and its progeny do not alter that conclusion. (*Ward, supra,* 36 Cal.4th at pp. 221–222.)

The Fifth, Sixth, Eighth, and Fourteenth Amendments are not violated by the use of the adjectives "extreme" and "substantial" in connection with section 190.3, factors (g) and (d). (*Manriquez, supra,* 37 Cal.4th at p. 590.) There is no constitutional requirement that the court instruct the jury which factors are aggravating and which mitigating. (*People v. Moon* (2005) 37 Cal.4th 1, 41 [32 Cal.Rptr.3d 894, 117 P.3d 591].) The equal protection clause of the Fourteenth Amendment does not require that capital and noncapital defendants be subject to the same sentencing procedures or that capital defendants be afforded the same disparate sentencing review as noncapital defendants under the determinate sentencing law, because the two categories of defendants are not similarly situated. (*Manriquez, supra,* 37 Cal.4th at p. 590.) Nor does international law require the elimination of capital punishment in California. (*Ibid.*)

## III. Disposition

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied April 15, 2009.