Filed 3/19/13  P. v. Jennings CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037265 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1095239) |
| v. | |
| DAVID JENNINGS, | |
| Defendant and Appellant. | |

## I.  INTRODUCTION

Defendant David Jennings was convicted after jury trial of making a criminal threat (Pen. Code, § 422),[1] assault with a deadly weapon (§ 245, subd. (a)(1)), assault by means of force likely to produce great bodily injury (former § 245, subd. (a)(1)), and simple assault (§ 240).  The jury also found true the allegations that defendant personally used a deadly and dangerous weapon in the commission of the criminal threat and assault with a deadly weapon offenses.  (§§ 667, 1192.7, 12022, subd. (b)(1).)  The trial court sentenced defendant to four years in prison, with 318 days of presentence credits.

On appeal, defendant contends that 1) the prior testimony of a witness should not have been admitted at trial, 2) the court should have instructed the jury on the lesser included offense of attempted criminal threat, 3) the punishment on the criminal threat

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

count should have been stayed under section 654, and 4) he is entitled to additional presentence credit under the October 2011 version of section 4019.

For reasons that we will explain, we conclude that the trial court did not err in admitting the prior testimony of a witness, but that with respect to count 1, the criminal threat count, the jury should have been instructed on the lesser included offense of attempted criminal threat. We will reverse the judgment and remand for retrial of count 1, and we will also order the correction of clerical errors in the clerk's minutes.[2]

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Information*

Defendant was charged by information filed January 27, 2011. After the information was amended and after one count was dismissed, defendant was charged with one count of making a criminal threat (§ 422; count 1), two counts of assault with a deadly weapon (§ 245, subd. (a)(1); counts 2 & 4), and one count of assault by means of force likely to produce great bodily injury (former § 245, subd. (a)(1); count 3). The alleged victims were Veronica Nevarez (counts 1 & 2), Elizabeth Villa Gomez (count 3), and Darlene Su'a (count 4). The information further alleged that defendant personally used a deadly and dangerous weapon, a knife, in the commission of the offenses in counts 1, 2, and 4. (§§ 667, 1192.7, 12022, subd. (b)(1).)

Prior to trial, the prosecution filed a motion seeking to introduce the preliminary hearing testimony of Darlene Su'a based on the contention that she was unavailable.

---

[2] The clerk's minutes of April 8, 2011 (last corrected September 20, 2011), and the clerk's minutes of July 8, 2011 (last corrected July 22, 2011) indicate that defendant was convicted in count 4 of "PC 242." Section 242 defines simple *battery*, whereas section 240 defines simple *assault*. In this case, the jury was instructed as to, and the defendant was convicted of, simple *assault* in count 4. We will order the clerk's minutes corrected accordingly.

Following an Evidence Code section 402 hearing, the court granted the prosecution's request.

### B. The Trial Evidence

In December 2010, defendant and Veronica Marie Nevarez were living together with their three children in San Jose. At the time, several family members were staying at the residence, including Nevarez's mother Elizabeth Villa Gomez, Nevarez's sister Darlene Dolly Su'a, and Su'a's husband.

On December 19, 2010, defendant asked Nevarez for money while the two were at home. After she refused, he became angry and eventually started drinking whiskey in the front yard. Around 11:00 p.m., defendant asked Nevarez for a ride. She refused because he was "really drunk" and he wanted to get "more PCP."

The preliminary hearing testimony of Nevarez's sister, Su'a, was introduced at trial after the court determined that she was unavailable. Su'a testified that she was in the house with Nevarez when she heard Nevarez on the phone verbally refusing to give defendant a ride. Su'a heard a vehicle horn honking and defendant yelling, "Better come get a ride, or I'm going to crash this ship."

Nevarez testified that defendant, who was "very drunk," then drove Nevarez's van and crashed it into the garage door. After hearing the crash, several people who were in the house, including Nevarez and Su'a, went outside and saw defendant in the van. Nevarez exchanged words with defendant and then called 911. A recording of the 911 call was admitted into evidence. Nevarez testified that she then went back inside the house. Su'a also exchanged words with defendant. Su'a heard defendant say, "I'm going to run everybody down," which she interpreted as referring to everyone in the house.

Su'a went inside the house and grabbed her keys in order to move her car. She testified that as she was "walking out," defendant was "walking in" and holding a small brown folding knife that was open. Su'a said, "He has a knife," and tried to grab him. Defendant pushed her and said, "Ma'am, watch out." Su'a testified that defendant then

3

walked towards Nevarez, who was in the house, and said, "I'm going to fuck you up!" As defendant was approaching Nevarez, he swung the knife towards her. According to Su'a, Nevarez turned around towards defendant, grabbed a table, and threw it in front of him.

Nevarez testified that her back was turned when defendant entered the house. She heard her sister Su'a shout the following: "What are you doing"; "Go to sleep"; "He's blacked out"; "He has a knife"; "Go to sleep, David." At trial, a police officer testified that when he interviewed Nevarez after the incident, she stated that she had heard Su'a say, "He has a knife! Run!"

Nevarez testified that after she heard her sister say, "He has a knife," she turned around and saw defendant with a small knife. Nevarez testified that she did not "have any conversation" with defendant when she turned around and saw him, and that he did not threaten her. She testified that defendant "looked very, very drunk, not like his normal self," and that she was afraid. Defendant swung the knife in her direction without saying anything. Nevarez testified that she grabbed a table and threw it at him in order to "get a space between us."

Nevarez testified that defendant stepped on her foot. As she twisted her body to run, her knee "went out." She yelled that her knee "popped out," and she crouched between a couch and a wall. Defendant got on top of Nevarez, held her down between the neck and chest, and swung the knife at her. Su'a's husband grabbed and pulled defendant from behind. Su'a lay on top of Nevarez to protect her from defendant. Su'a then felt something "grazing" or "burning" on her back and thought defendant was stabbing her with the knife. The son of defendant and Nevarez ran in and hit defendant on the head with a trophy more than once while defendant kept trying to stab Nevarez. At some point, Lee Solia, a family friend, also held defendant's arms in an attempt "to keep him from doing any harm" to Nevarez. Eventually defendant backed off and Nevarez "squirmed out" and ran towards the front door. As Nevarez was leaving the

4

house, she saw a blue-handled knife on the floor. She grabbed it because she did not want defendant to pick it up, and she threw it on the ground when the police arrived. At trial, pictures of the room where defendant assaulted Nevarez were introduced into evidence.

During the incident, Gomez, the mother of Nevarez and Su'a, was yelling, "He's stabbing my daughter!" After Nevarez exited the house, defendant went up to the mother and said, "I'm going to fuck your ass up," and "Fuck you, bitch!" He then punched the mother in the face. Defendant subsequently exited the house and threw the knife that he had used to attack Nevarez.

The mother suffered multiple injuries, including a laceration to her right upper lip, and she received a total of seven sutures to the outside and inside of her lip. Su'a had red marks that were slightly raised on her back. Nevarez suffered injuries to her face and foot. She also testified that she was "poke[d]" in the arm with the knife, which caused her to bleed and left a scar.

When the police arrived and approached the house, defendant and Su'a's husband were arguing while coming out the front door. The police later observed defendant to be loud and incoherent. He had a laceration on his head and three puncture wounds on his left side near his waist. Defendant lost consciousness a few minutes after medical personnel arrived. At trial, the parties stipulated that defendant's blood alcohol level was 0.15 percent and that he tested positive for phencyclidine (PCP) based on blood drawn from him shortly after the incident. The police found two knives at the scene—a folding knife with a brown handle and a knife with a blue handle.

The police had previously been called to Nevarez's residence approximately six months prior, in June 2010. That day, Nevarez gave defendant a ride to buy drugs and also picked up his friend. While defendant was smoking a PCP joint in the vehicle, Nevarez told him and his friend that they "weren't allowed in the house when under the influence of PCP." During the ride, defendant told his friend that he needed a gun.

5

Nevarez testified that defendant was "out of it, loaded." She told him he was "fucking stupid" and that "if he continued acting that way [she] would get a restraining order."

After they arrived home, Nevarez called the police because defendant had a knife and "was flipping out in the front yard." In a recording of the 911 call, which was played for the jury, Nevarez stated that defendant was "burnt on drugs" and "threatening us," and that she wanted him "out of here." She further stated that defendant needed "help." Nevarez reported that defendant had told his friend to get him a gun, and that she was "afraid to be here. 'Cause his mind isn't right at all." At trial, Nevarez denied that defendant had threatened her before she called 911, and denied that she was worried about her own safety. She testified that she called 911 because defendant was on PCP and she wanted him taken to a hospital to get help.

While Nevarez was talking to the 911 operator, defendant and a friend left in a vehicle. When police stopped the vehicle, defendant was in the passenger seat and the knife that he had been waving at the residence was in the pocket of the passenger door. A San Jose police officer testified that, based on his training, experience, and observations of defendant's symptoms, defendant was under the influence of PCP.

At trial, Nevarez admitted that she was convicted of misdemeanor welfare fraud in 2005. The parties stipulated that Su'a was convicted of felony grand theft in 2005, and that she was convicted of misdemeanor giving a false name to a police officer in February 2010.

C. *The Verdicts and Sentencing*

In April 2011, the jury found defendant guilty of making a criminal threat to Nevarez (§ 422; count 1), assault with a deadly weapon of Nevarez (§ 245, subd. (a)(1); count 2), and assault by means of force likely to produce great bodily injury of Gomez (former § 245, subd. (a)(1); count 3). The jury also found defendant guilty of simple assault, a lesser offense of assault with a deadly weapon charged in count 4, of Su'a. The jury found true the allegations that defendant personally used a deadly and dangerous

6

weapon in the commission of the offenses in counts 1 and 2. (§§ 667, 1192.7, 12022, subd. (b)(1).)

In July 2011, the trial court sentenced defendant to four years in prison. The sentence consists of the middle term of three years on count 2 (§ 245, subd. (a)(1)), a consecutive term of one year (one-third the middle term of three years) on count 3 (former § 245, subd. (a)(1)), and a concurrent term of eight months (one-third the middle term of two years) on count 1 (§ 422). The court also indicated that the sentence for the personal-use enhancement (§ 12022, subd. (b)(1)) on count 1 would run concurrent, but the clerk's minutes of the hearing and the abstract of judgment indicate that the sentence for the enhancement was stayed. The court imposed a concurrent six-month jail term for the simple assault (§ 240; count 4). The court also granted defendant 318 days of presentence credits and imposed various fines and fees, including $120 pursuant to section 1465.8 and $90 pursuant to Government Code section 70373 for defendant's three felony convictions. The court stated that the "fines and fees" for the misdemeanor conviction were "waived in view of the fines and fees on the felony."**[3]**

### III. DISCUSSION

#### A. *Admission of Preliminary Hearing Testimony*

The prosecution was allowed to introduce at trial preliminary hearing testimony by Su'a after the court ruled that she was unavailable as a witness. Through the preliminary hearing testimony by Su'a, the jury learned that defendant walked towards Nevarez during the more recent December 2010 incident and said, "I'm going to fuck you up!"

---

**[3]** Any amounts required to be imposed under section 1465.8 and Government Code section 70373 are mandatory and are not subject to a defendant's ability to pay. (See *People v. Kim* (2011) 193 Cal.App.4th 836, 842; *People v. Woods* (2010) 191 Cal.App.4th 269, 272.)

7

Defendant contends that the trial court erred by finding Su'a unavailable because the prosecution did not exercise "due diligence" in attempting to secure her attendance at trial. He argues that the introduction of testimony by Su'a violated his constitutional right of confrontation, the error was prejudicial, and his conviction on count 1 should be reversed.

The Attorney General contends that the prosecution used reasonable efforts to locate Su'a, and that the trial court properly admitted her preliminary hearing testimony after finding her unavailable as a witness.

### 1. Background

On March 30, 2011, the prosecution filed a pretrial motion seeking to introduce the preliminary hearing testimony of Su'a based on the contention that she was unavailable pursuant to Evidence Code section 240. That same day and continuing on April 4, 2011, the court held an Evidence Code section 402 hearing regarding the prosecution's efforts to procure the attendance of Su'a.

James Garcia, a legal process officer from the district attorney's office, testified that he was assigned to serve a subpoena on Su'a. Although the assignment was "originally issued" to him on February 25, 2011, he did not begin service attempts until March 2, 2011. The "time lapse" was due to a new secretary on staff and training issues.

Garcia had previously served a subpoena on Su'a at her residence in San Jose on January 13, 2011, for the preliminary hearing. He had also served subpoenas for the preliminary hearing on the others who were living at the same address as Su'a, including Nevarez. At the time of service, all the witnesses, including Su'a, were cooperative.

On March 2, 2011, Garcia returned with the trial subpoena to the same address where he had previously served Su'a for the preliminary hearing. Garcia testified that the residence looked "different" in that it was "a lot more clean and . . . neat. The front yard was manicured and the garage was emptied out" with only a car parked inside. Garcia learned that a new tenant had just moved into the address and that the new tenant did not

8

have any forwarding information for the prior tenant. Garcia returned to his office and conducted searches on multiple databases. He searched a DMV database to try to find a new address for Su'a. He also searched a criminal database, CLETS, but was unable to find anything. Garcia also searched a third party database, which the district attorney's office had been paying for access and which contained information about "anything from employment histories to new addresses to phone numbers and so on . . . ." Using this third party database Garcia obtained two addresses, one in Santa Clara and one in San Jose, neither of which he had previously visited. The database indicated that the Santa Clara address had been used more recently, from 2002 to January 2011, while the San Jose address was "older" and had last been used in November 2010.

The next day, on March 3, 2011, Garcia went to the Santa Clara address. Present at the address were an older male who spoke only Spanish and an older female who "tended to speak broken Spanish." Garcia spoke "very little" Spanish, but in the course of his employment he knew "basic words" such as "this person is here or not here." Garcia displayed a picture of Su'a and showed her name on the subpoena. The male and female did not recognize Su'a. The male indicated that no one with the name of Su'a lived at the address, and that they, the current tenants, had moved in two months prior. During the Evidence Code section 402 hearing, Garcia was asked whether he inquired of the current tenants if "they had any forwarding information in terms of mail or perhaps a way to contact the landlord, anything like that." Garcia testified that he asked the female "if there's any contact number," and she said "no."

Between March 2 or 3, and March 16, 2011, Garcia tried to reach Su'a by phone with a number that he had obtained from a police report. He did not have occasion to speak to her by phone prior to that time, because she and the other residents had been cooperative and at home when he served the subpoenas for the preliminary hearing. This time, Garcia called her on four or five occasions at different times of the day and evening. His calls went to a voicemail that stated the phone number but did not include a voice

9

greeting. Each time he called, Garcia left a message identifying himself and asking Su'a to return the call. Garcia did not contact any phone company or cell phone provider to determine whether the number had been changed because in the past he had "never had access to that" type of information.

On March 10, 2011, Garcia went to the older address in San Jose, which he had obtained from the third party database, to determine whether it was a "valid" address. A male indicated that no one with the name of Su'a lived there, and that mail received in the past had been returned to the post office. That same day, Garcia checked with the post office to determine whether a change of address had been listed for Su'a, or the other individuals who had been living with her, for the address at which Garcia had previously successfully served her. The postal check yielded the same San Jose address that Garcia had already visited, as well as another San Jose address.

On March 14, 2011, Garcia went to this other San Jose address, but the resident indicated that no one with the name of Su'a lived there.

Garcia had been in phone contact with Nevarez, the sister of Su'a. Garcia asked Nevarez for information about her sister's whereabouts, but Nevarez was "very vague" in her responses. She stated that everyone had moved from the address where Su'a had previously been served with a subpoena, and that everyone "went their separate ways." According to Nevarez, Su'a was staying at the homes of various family members and did not have a permanent address. Nevarez also mentioned that Su'a was staying "off and on" with an uncle, but Nevarez did not provide the uncle's name when asked and stated that she did not know the uncle's address. The mother of Su'a was in the hospital according to Nevarez, but Nevarez did not tell Garcia the name of the hospital. Garcia asked Nevarez three times to pass a message on to Su'a.

10

Garcia continued checking the third party database through March 16, 2011, but the database did not provide a new address for Su'a. Garcia also talked to "Lee Solis,"[4] but Solis refused to provide any information, including whether he knew where Su'a worked. The police report reflected that Su'a was unemployed. Garcia talked to his supervisor about the case, and the case was reassigned to an investigator.

Cristina Palomino, a detective from the district attorney's office, testified that she received the assignment to serve Su'a with a subpoena on March 18, 2011. Palomino first reviewed the file and the work done by Garcia. She confirmed that he had looked into all the databases that were available and had done all the footwork that he could do up to that point. She did not find anything missing or anything else to follow up on.

That same day, on March 18, 2011, Palomino served a subpoena on Nevarez at work. When Palomino asked about the location of Su'a, Nevarez indicated that everyone had moved from the address where the subpoenas for the preliminary hearing had been served. She told Palomino to call Su'a and indicated that Palomino "was probably going to be able to make contact with [Su'a]." Nevarez confirmed the phone number for Su'a but indicated that "she was not going to give [Palomino] anymore information."

Palomino called the phone number and left two messages for Su'a on March 18, and another message on March 21, 2011. Palomino also called the number several times without leaving a message, and she called at different times of the day. She used her office and cell phones to call, as her cell phone displayed a "normal number" when used to call someone else. Whenever Palomino called, the phone rang several times before she heard a female voice on the voicemail greeting. Palomino never received a call back from Su'a. Palomino also tried to contact Gomez, Nevarez's mother, with a phone

_____

[4] Garcia may have been referring to Lee Solia, who subsequently testified at trial.

number that Nevarez had confirmed, but was unsuccessful. Palomino made no further attempts to locate Su'a after March 21, 2011.

After hearing argument from the parties, the trial court found Su'a unavailable as a witness and ruled that her preliminary hearing testimony could be presented at trial. The court stated that "the dates in this case [were] pretty compressed." The court observed that the preliminary hearing was held on January 19, 2011, that a few days later on January 31 "the case was given a master trial date of March 21st with a last day of April 1st," and that "[e]fforts to locate the witness began on March 2nd and continued on to March 21st." After referring to the testimony and the legal requirements concerning witness unavailability, the court concluded that "due diligence ha[d] been shown" by the prosecution.

## 2. Analysis

" 'A defendant has a constitutional right to confront witnesses, but this right is not absolute. If a witness is unavailable at trial and has testified at a previous judicial proceeding against the same defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial. [Citations.] The constitutional right to confront witnesses mandates that, before a witness can be found unavailable, the prosecution must "have made a good-faith effort to obtain his presence at trial." ' [Citation.] California law and federal constitutional requirements are the same in this regard. [Citation.] Moreover, for the prior testimony to be admissible, the defendant must have had the opportunity to cross-examine the witness at that hearing with an interest and motive similar to that which defendant has at the hearing at which the testimony is admitted. [Citations.]" (*People v. Valencia* (2008) 43 Cal.4th 268, 291-292 (*Valencia*); accord *People v. Herrera* (2010) 49 Cal.4th 613, 620-622 (*Herrera*); see Evid. Code, § 240, subd. (a)(5) [witness is unavailable if the witness is absent from the hearing and the proponent of the witness's statement "has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process"].)

12

" 'The proponent of the evidence has the burden of showing by competent evidence that the witness is unavailable.' [Citation.]" (*Valencia*, *supra*, 43 Cal.4th at p. 292.)  This requires a showing of "due diligence" in trying to find the witness.  (*Ibid.*) "The term 'due diligence' ' "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character." ' [Citation.] 'Relevant considerations include " 'whether the search was timely begun' " [citation], the importance of the witness's testimony [citation], and whether leads were competently explored [citation].' [Citation.]" (*Ibid.*; accord *Herrera*, *supra*, 49 Cal.4th at p. 622.)  "[D]iligence has been found when the prosecution's efforts are timely, reasonably extensive and carried out over a reasonable period.  [Citations.]" (*People v. Bunyard* (2009) 45 Cal.4th 836, 856 (*Bunyard*).)  "When, as here, the relevant facts are undisputed, we review this determination independently.  [Citation.]" (*Valencia*, *supra*, at p. 292.)

In this case, defendant contends that the prosecution did not demonstrate diligence because there was an unreasonable delay in beginning the search for Su'a, the actual search efforts were inadequate, and the search efforts were "abandoned" too early.

We determine that the trial court did not err in determining that the prosecution exercised due diligence in attempting to locate Su'a for trial.  Although testimony from Su'a was important to the criminal threat count against defendant, the prosecution had readily located and served Su'a on January 13, 2011, for the preliminary hearing.  She was cooperative at that point, and the prosecution had no indication that she was going to become uncooperative or potentially unavailable for trial until service efforts began on March 2, 2011.  (See *People v. Friend* (2009) 47 Cal.4th 1, 68-69 [prosecution not required to maintain regular contact with witness where prosecution does not know or have reason to know of a substantial risk that the witness will flee or otherwise disappear]; cf. *People v. Cromer* (2001) 24 Cal.4th 889, 903-905 (*Cromer*) [reasonable diligence not exercised where prosecution received report of witness's disappearance within two weeks after preliminary hearing and made no serious effort to locate her until

13

shortly before trial approximately six months later].) Further, as the trial court observed, "the dates in this case [were] pretty compressed." Although on January 31, 2011, a "master trial date" of March 21 was set, Su'a had been cooperative when subpoenaed to appear for the January 19 preliminary hearing, which had only just taken place. On this record, we cannot say that the prosecution displayed a lack of diligence by initiating service efforts on March 2, 2011, which was 30 days after the setting of the "master trial date" and 19 days before the "master trial date" itself.

Further, upon initiating service efforts, the prosecution exercised reasonable diligence. Garcia visited the address where he had previously served Su'a, he searched all the databases available to him, and he promptly visited each of the resulting addresses. At each address, he attempted to obtain forwarding information. Garcia also repeatedly tried to reach Su'a by phone at various times of the day and evening. Further, he attempted to obtain information from Nevarez, the sister of Su'a, and from Solis. When Palomino received the file, she reviewed Garcia's attempts to find Su'a, and then sought further information from Nevarez. Nevarez did not provide any additional information other than to confirm the phone numbers for Su'a and the mother. Palomino repeatedly called Su'a and also attempted to call the mother.

We are not persuaded by defendant's arguments concerning a lack of diligence on the prosecution's part. For example, defendant contends based on *Cromer* that the prosecution should have made further efforts to contact the mother of Su'a, including searching for her in hospitals or locating her home. However, unlike in *Cromer*, where the prosecution investigators were told by an individual at the witness's former home that the witness was living with her mother (*Cromer*, *supra*, 24 Cal.4th at p. 903), the prosecution in this case had no information suggesting that Su'a and her mother were living together. To the contrary, Garcia had been told by Nevarez that everyone "went their separate ways" after moving out of the shared residence and that the mother was in the hospital at some point. We also observe that no evidence supports defendant's

14

suggestion that the prosecution had access to billing address information for the phone number used by Su'a. Rather, Garcia testified that he "never had access" to certain phone records, and Palomino testified that all available databases had been searched by Garcia. We are also not persuaded by defendant's contention that the prosecution should have returned to the Santa Clara address with a Spanish interpreter. Garcia had already ascertained that Su'a did not live there, and that her current contact information could not be obtained there. Along these lines, Nevarez had indicated to Garcia that Su'a was staying at various homes and did not have a permanent address. Defendant similarly fails to persuasively articulate why Palomino should have sought information from Solis, after he had already refused to provide any information to Garcia. Further, in view of defendant's assertion that David Jennings, Jr. himself failed to appear at the preliminary hearing in defiance of a "direct court order," defendant fails to persuasively articulate why the prosecution should have attempted to contact him concerning the whereabouts of Su'a.

Lastly, we are not persuaded by defendant's argument that the prosecution's failure to continue looking for Su'a establishes a lack of due diligence. The jury heard evidence beginning on April 5, 2011. By March 21, 2011, however, when Palomino left the last phone message for Su'a, the prosecution had competently explored all leads concerning the possible location of Su'a, including visiting last known addresses, repeatedly attempting to reach Su'a by phone, repeatedly speaking to her sister who provided only limited information, and attempting to obtain information from others who knew Su'a. The prosecution's efforts were "timely, reasonably extensive and carried out over a reasonable period." (*Bunyard*, *supra*, 45 Cal.4th at p. 856.) Accordingly, we determine that the trial court did not err by finding Su'a unavailable and by allowing the use of her preliminary hearing testimony at trial.

15

**B.** *Jury Instruction*

Defendant contends that the trial court erred by failing to instruct the jury sua sponte on the lesser included offense of attempted criminal threat. He argues that the trial court had a sua sponte duty to instruct on that offense "because the evidence raised a question as to whether Nevarez heard the threat." Defendant asserts that a "properly-instructed jury" would have convicted him of this offense.

The Attorney General contends that the trial court did not have a sua sponte duty to instruct the jury on an attempted criminal threat because there was not substantial evidence to support such a crime and there is no precedent establishing that the offense has been committed where the defendant fails to articulate any threat. The Attorney General further contends that any error was harmless.

### 1. Background

Su'a testified that during the December 2010 incident, she saw defendant walk towards Nevarez and said, "I'm going to fuck you up!" Nevarez, however, testified that she did not "have any conversation" with defendant when she turned around and saw him, and that he did not threaten her. She further testified that defendant swung the knife in her direction without saying anything.

The record does not reflect that defendant requested a jury instruction regarding the offense of attempted criminal threat. The trial court did instruct the jury regarding the offense of making a criminal threat pursuant to CALCRIM No. 1300.[5] The court also

---

[5] The jury was instructed regarding the offense of making a criminal threat as follows: "The defendant is charged in count one with having made a criminal threat in violation of Penal Code section 422. To prove that the defendant is guilty of this crime, the People must prove that: [¶] (1) The defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to Veronica Nevarez; [¶] (2) The defendant made the threat orally; [¶] (3) The defendant intended that his statement be understood as a threat; [¶] (4) The threat was so clear, immediate, unconditional, and specific that it communicated to Veronica Nevarez a serious intention that the immediate prospect of the (continued)

16

instructed the jury that defendant was not guilty of the criminal threat count if he acted while legally unconscious, and that the jury may consider evidence of voluntary intoxication in deciding whether defendant acted with the specific intent required for the criminal threat count. (See CALCRIM Nos. 3425 & 3426.)

In opening argument, the prosecutor told the jury that defendant's statement, "I'm going to fuck you up," to Nevarez was the act constituting the basis for the criminal threat count. Although Su'a was the only witness to testify about the threat, the prosecutor argued that Nevarez must have heard the threat. In this regard, the prosecutor contended that defendant and Su'a were near the door of the "little" living room where Nevarez was located, that Nevarez heard "everything" that Su'a had stated, and that therefore Nevarez must have also heard defendant's threat. The prosecutor also contended that Nevarez was "minimizing" at trial the statements by defendant and by Su'a. According to the prosecutor, "we know [Nevarez] heard this threat" because "she reacts like she hears the threat" by moving the table and she testified that she was afraid.

Defense counsel argued to the jury that the criminal threat count was a specific intent crime and that the jury needed to consider whether, in view of defendant's intoxication, "was he in a position to make that threat." Defense counsel also raised the issue of whether Nevarez "felt the threat" and argued that the "only reason her state of

---

threat would be carried out; [¶] (5) The threat actually caused Veronica Nevarez to be in sustained fear for her own safety; and [¶] (6) Veronica Nevarez's fear was reasonable under the circumstances. [¶] Someone commits an act willfully when he or she does it willingly or on purpose. In deciding whether a threat was sufficiently clear, immediate, unconditional, and specific, consider the words themselves as well as the surrounding circumstances. Someone who intends that a statement be understood as a threat does not have to actually intend to carry out the threatened act. [¶] 'Great bodily injury' means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. [¶] 'Sustained fear' means fear for a period of time that is more than momentary, fleeting, or transitory. [¶] An immediate ability to carry out the threat is not required."

17

mind changed" was because of her sister Su'a yelling, "He's got a knife, run!" Defense counsel told the jury to "ask yourself whether my client was voluntarily intoxicated and whether you still feel that he was in a position to make that threat, he knew what that threat was and whether or not [Nevarez] was in sustained fear for her own safety." Defense counsel also argued that defendant was unconscious when he entered the residence.

In closing argument, the prosecutor contended that the evidence showed defendant acted with the intent his statement would be understood as a threat, and that there was no evidence he was unconscious or that he was so intoxicated he did not know what he was doing. The prosecutor further argued that threat actually caused Nevarez to be in fear and that her fear was reasonable in the circumstances.

The jury found defendant guilty of making a criminal threat.

## 2. Analysis

"A criminal defendant has a constitutional right to have the jury determine every material issue presented by the evidence, and an erroneous failure to instruct on a lesser included offense constitutes a denial of that right. To protect this right and the broader interest of safeguarding the jury's function of ascertaining the truth, a trial court must instruct on an uncharged offense that is less serious than, and included in, a charged greater offense, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged greater offense are present. [Citations.] [¶] But this does not mean that the trial court must instruct sua sponte on the panoply of all possible lesser included offenses. Rather, . . . ' "such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." ' [Citation.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 215.) Thus,

18

" '[w]hen there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of a lesser included offense, the court must instruct upon the lesser included offense, and must allow the jury to return the lesser conviction, even if not requested to do so.' " (*Ibid.*)

"In order to prove a violation of section 422,[6] the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228 (*Toledo*).)

Attempted criminal threat (§§ 664, 422) is a lesser included offense of criminal threat. (See *Toledo, supra,* 26 Cal.4th at pp. 226, 230-231, 232; *In re Sylvester C.* (2006) 137 Cal.App.4th 601, 607.) "[A] defendant properly may be found guilty of attempted

---

[6] Section 422 states: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished . . . ."

criminal threat whenever, acting with the specific intent to commit the offense of criminal threat, the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action.  Furthermore, in view of the elements of the offense of criminal threat, a defendant acts with the specific intent to commit the offense of criminal threat only if he or she specifically intends to threaten to commit a crime resulting in death or great bodily injury with the further intent that the threat be taken as a threat, under circumstances sufficient to convey to the person threatened a gravity of purpose and an immediate prospect of execution so as to reasonably cause the person to be in sustained fear for his or her own safety or for his or her family's safety."  (*Toledo*, *supra*, at pp. 230-231.)

The California Supreme Court has explained that "[a] variety of potential circumstances fall within the reach of the offense of attempted criminal threat.  For example, if a defendant takes all steps necessary to perpetrate the completed crime of criminal threat by means of a written threat, but the crime is not completed only because the written threat is intercepted before delivery to the threatened person, the defendant properly may be found guilty of attempted criminal threat.  Similarly, if a defendant, with the requisite intent, orally makes a sufficient threat directly to the threatened person, but for some reason the threatened person does not understand the threat, an attempted criminal threat also would occur.  Further, if a defendant, again acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not actually cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat.  In each of these situations, only a fortuity, not intended by the defendant, has prevented the defendant from perpetrating the completed offense of criminal threat itself."  (*Toledo*, *supra*, 26 Cal.4th at p. 231, italics omitted; see also *id* at p. 234 [explaining that the examples reflect "circumstances

20

in which the defendant in fact has engaged in *all* of the conduct that would support a conviction for criminal threat, but where the crime of criminal threat has not been completed only because of some fortuity outside the defendant's control or anticipation"].)

In this case, we determine that the jury should have been instructed as to the offense of attempted criminal threat. Su'a testified that defendant walked towards Nevarez and said, "I'm going to fuck you up," before swinging the knife at Nevarez. In contrast, Nevarez testified that defendant did not threaten her when she first saw him, and that he did not say anything to her when he first swung the knife. In view of this testimony, there was substantial evidence from which the jury might reasonably conclude that defendant *made* the threat but Nevarez *did not hear* the threat, and thus she was not *actually* in sustained fear as a result of the threat. The jury thus might have found that defendant's threat constituted only attempted criminal threat, if the jury had been instructed as to this offense. (See *People v. Teal* (1998) 61 Cal.App.4th 277, 281 [a defendant is guilty of making a criminal threat if "the threat is received and induces sustained fear"]; *Toledo*, *supra*, 26 Cal.4th at p. 231 [examples of an attempted criminal threat include where the victim does not receive the threat or where the threat does not actually cause the victim to be in sustained fear].)

The Attorney General contends that, assuming the evidence supported the conclusion that defendant had the specific intent to make a threat, but *failed to actually articulate a threat*, "there is no precedent . . . establishing the defendant nevertheless commits the crime of attempted criminal threat." According to the Attorney General, "[i]t would be unfair to impose on the trial court, in this case, a sua sponte duty that required it, in effect, to discern the unresolved legal issue, to predict how the issue would be resolved by an appellate court, and then to embody its prediction in an instruction on a lesser offense."

21

As we have explained, an instruction regarding the offense of attempted criminal threat should have been given in this case based on the evidence giving rise to a reasonable conclusion that defendant *made* the threat but Nevarez *did not hear* the threat. Whether a sua sponte duty to instruct regarding attempted criminal threat might also arise when the defendant *failed to articulate a threat* is not an issue that we need to decide in this case.

We next turn to the question of whether the failure to instruct as to the offense of attempted criminal threat was prejudicial. Any error in failing to instruct on a lesser included offense does not warrant reversal unless an examination of the entire cause, including the evidence, discloses that "it appears 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred." (*People v. Breverman* (1998) 19 Cal.4th 142, 149 (*Breverman*); see *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) "There is a reasonable probability of a more favorable result . . . when there exists 'at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error affected the result.' ([*Watson*], *supra*, 46 Cal.2d at p. 837.)" (*People v. Mower* (2002) 28 Cal.4th 457, 484 (*Mower*).) In undertaking this inquiry, "an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Breverman*, *supra*, at p. 177.)

In this case, we determine that the failure to instruct as to the offense of attempted criminal threat was prejudicial. The testimony by Nevarez and Su'a was conflicting regarding whether defendant made the threat. Further, although the prosecutor argued to the jury that Nevarez must have heard the threat because she reacted by moving a table, there was also evidence that defendant was approaching Nevarez at that time and swinging the knife towards her. Nevarez's reaction was thus equally consistent with her

not having heard any threat from defendant and only seeing him advance with a knife. We also are not persuaded by the Attorney General's argument that the error in this case was harmless based on the jury's finding of guilt on the criminal threat count, and the jury's rejection of the theories that defendant was legally unconscious, voluntarily intoxicated, or otherwise lacked the requisite specific intent. Although the failure to instruct on a lesser included offense " 'is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under *other* properly given instructions' " (*People v. Lancaster* (2007) 41 Cal.4th 50, 85, italics added), a defendant's conviction of the *charged offense* on substantial evidence does not render harmless per se an error in failing to instruct on a lesser included offense. (*Breverman*, *supra*, 19 Cal.4th at p. 178, fn. 25; *People v. Hayes* (2006) 142 Cal.App.4th 175, 182-183 (*Hayes*).) Further, the jury's determinations concerning unconsciousness, intoxication, and specific intent did not require the jury to decide whether Nevarez had heard a threat by defendant. Accordingly, after carefully considering the record in this case, we believe "there exists 'at least such an equal balance of reasonable probabilities as to leave the court in serious doubt' " as to whether the failure to instruct as to the offense of attempted criminal threat affected the result in this case, and thus reversal is warranted. (*Mower*, *supra*, 28 Cal.4th at p. 484; see *Breverman*, *supra*, at p. 149.)

Regarding the appropriate remedy, defendant asserts in his opening brief that this court should reduce his conviction on count 1 for making a criminal threat to attempted criminal threat. The Attorney General contends that the prosecutor should be given the option of retrying the greater offense or accepting a reduction to the lesser offense. In reply, defendant contends that, unless the prosecution "files a petition for rehearing expressing a desire to retry the case," this court should reduce his conviction to attempted criminal threat.

We believe the Attorney General's approach is appropriate in this case. "When a greater offense must be reversed, but a lesser included offense could be affirmed, we give

23

the prosecutor the option of retrying the greater offense, or accepting a reduction to the lesser offense. [Citation.]" (*People v. Kelly* (1992) 1 Cal.4th 495, 528; accord *Hayes, supra,* 142 Cal.App.4th at p. 184.)

### C. *Section 654*

On appeal, defendant contends that the sentence on count 1 for making a criminal threat to Nevarez should have been stayed under section 654, rather than run concurrent, because "that offense and his assault on Nevarez arose from an indivisible course of criminal conduct."

The Attorney General agrees that the punishment on count 1 should have been stayed under section 654. The Attorney General further states that the sentence on count 1 "requires correction" because the trial court should not have used the one-third formula for subordinate terms.

Because we are remanding for retrial of count 1, making a criminal threat to Nevarez, we need not address the sentencing issues raised by defendant or the Attorney General.

### D. *Conduct Credit*

In his opening brief on appeal, defendant contended that he was entitled to additional conduct credit under the current version of section 4019. After briefing was completed in this case, the California Supreme Court issued its decisions in *People v. Brown* (2012) 54 Cal.4th 314, and *People v. Lara* (2012) 54 Cal.4th 896, addressing certain amendments to section 4019. In supplemental briefing, defendant acknowledges that these two opinions "preclude" his claim for additional conduct credit and he "withdraws" his claim.

## IV. DISPOSITION

The judgment is reversed and remanded for retrial of count 1, the criminal threat count (§ 422). If the prosecution does not elect to retry that count, the trial court shall reduce that count to the lesser included offense of attempted criminal threat (§§ 664, 422)

and resentence defendant. Regardless of whether the prosecution elects to retry count 1, the clerk of the superior court is ordered to correct the minutes of April 8, 2011 (last corrected September 20, 2011), and the minutes of July 8, 2011 (last corrected July 22, 2011), to reflect that defendant was convicted in count 4 of section 240 for misdemeanor simple assault, and not section 242.

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____

RUSHING, P.J.

_____

PREMO, J.