Filed 5/5/16  P. v. Sandoval CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>ARMONDO SANDOVAL,<br><br>　　　Defendant and Appellant. | B264631<br><br>(Los Angeles County<br>Super. Ct. No. BA325750) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Edmund Wilcox Clarke, Jr., Judge.  Affirmed as modified.

H. Russell Halpern for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Amanda V. Lopez, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury convicted Armondo Sandoval of second degree murder (Pen. Code, § 187),[1] second degree robbery (§ 211), and assault with a firearm (§ 245, subd. (a)(2)). By the time of trial, the prosecution was unable to locate one of the eyewitnesses who testified at the preliminary hearing. The trial court determined the prosecution exercised reasonable diligence in attempting to secure the witness's attendance at trial. The court thus allowed the People to read the witness's preliminary hearing testimony to the jury. On appeal, Sandoval contends this was error. We direct the trial court to correct an omission in the abstract of judgment and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We summarize the evidence in accordance with the usual rules on appeal. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1263.) Around 3:00 a.m. on July 13, 2007, R. Bass and B. Dennis were together at Broadway and 42nd Street in Los Angeles. According to Bass, she had been smoking marijuana that day and was drinking beer. Dennis had used cocaine and was drinking gin. Kenneth Johnson and Theodore Giddens, who was also known as "Ishu," were nearby. Johnson was in his car. Defendant came into the area and began spray painting a wall. He then approached Bass, Dennis, and others with them, waved a gun at them, and demanded money. Defendant and Giddens argued. Defendant followed Giddens down an alley and began shooting. In an interview with police, Bass identified defendant as the shooter from a photographic lineup. At the trial in 2014, Bass again identified defendant as the man with the gun.

J. Davie told police he was present during the incident. Davie saw defendant walk up to Johnson, discuss dope, and yell something about "Four Trey." Defendant first shot at Johnson, then he began yelling at Giddens. Giddens ran down an alley as defendant shot at him. Davie saw defendant walk back down 42nd Street toward Main. Davie

---

[1] All further statutory references are to the Penal Code.

identified defendant from a photographic lineup as the man he saw shoot at Johnson and Giddens.**2**

Before an ambulance took him to the hospital, Johnson told police he had been parked in a lot at 42nd Street and Broadway, talking to Giddens. A bald, shirtless, Hispanic male of small build approached Giddens. The man's upper body was covered with tattoos. The man pulled out what appeared to be .45 caliber handgun, pointed it at Giddens, and said, repeatedly, "You got a beef?" Johnson began driving away. The man began shooting. Johnson realized he had been shot. He drove himself to the police station. Johnson later died from a gunshot wound to the chest. He had cocaine in his system at the time of death.

At around 3:30 a.m. on the morning of the shooting, J. Verduzco was standing in the area of Vernon and Main in Los Angeles. Defendant, shirtless, approached Verduzco. He pointed a gun at Verduzco's head and asked, "Where are you from?" Verduzco answered he "wasn't from anywhere," meaning he did not belong to a gang. Defendant demanded Verduzco's wallet and cell phone, then he hit Verduzco on the head with the gun. Verduzco identified defendant from a photographic lineup as a person who looked like the man who attacked him. At trial, Verduzco identified defendant as the man who attacked him.

Around 3:30 a.m. on the morning of the shooting, Los Angeles Police Department officer Dana Grant was patrolling near 42nd Street and Broadway, searching for a suspect in response to a call about the incident. On 42nd Street and Main, Grant saw someone matching the description of the suspect: a Hispanic male with no shirt, a bald head, and

---

**2**  At trial, Davie recanted his previous statements to police. He insisted he was not present when Giddens was shot, he did not see Giddens get shot, and he did not tell police he witnessed the shooting. He testified he was unable to read or write and the police investigator simply "wrote stuff" and told him to sign his name. Although Davie told police he knew defendant as a person named "Nano," at trial Davie said defendant did not look like Nano and the Nano he knew was much smaller than defendant.

covered in tattoos.[3]  Defendant was standing near a house.  Grant found Verduzco's wallet and cell phone on the ground nearby.  Later that day, police discovered a gun on the porch of the house.  A criminalist determined casings found in the alley where Giddens was shot matched the gun and magazine found on the porch.[4]

A recording of one of defendant's telephone conversations from jail was played for the jury.  In the call, defendant identified himself as "Nano."  He explained he had the "murder book" and had seen "the whole file.  Everything."  Defendant directed the other person on the call to "get at" certain individuals, and said others needed to "take off." Defendant explained: "I already got the . . . written statement . . . signed and everything from that fool . . . against me. . . . You let him know to fuck that fool up."  Defendant then asked if the other man knew Dennis, who he described as "the shortest one.  The smallest one. . . . She hangs out there where the Arrowhead . . . she's always sitting there."  Defendant continued: "The tiny one, she is the main witness fool. . . . She says she saw everything, fool.  Yeah, fool.  She saw everything.  Everything.  I got her shit too.  I got her shit on her too. . . . Everything, fool.  Everything here, fool.  Because yesterday they gave me the murder – they gave me everything fool."  As the associate said he would "get" another person, defendant returned to Dennis:  "The tiny one is the one who worries me more, fool. . . ."  The associate asked: "Her name is [Dennis], right?"  When defendant confirmed the name, the associate said he would try to find out where she lived, and: "[W]e will make her disappear, it's better."  Defendant answered: "Yeah."

_____

[3]     At the 2014 trial, Grant did not recognize the person she detained that night in the courtroom.  However, she recognized a photograph of defendant taken on the night of the incident as the person she arrested.

[4]     However, the bullet recovered from Johnson's body could not have been fired from the gun found on the porch.  Defendant was not tried for the murder of Johnson.

At trial, a gang expert opined defendant was a member of the Hang Out Boys gang, a rival of the Four Trey gang. The Hang Out Boys claimed a territory that included the area where the shooting occurred, but that territory was entirely surrounded by an area claimed by the Four Trey gang. Using photographs, the expert testified defendant had gang-related tattoos on his stomach, back, and left and right biceps. Defendant was identified in field identification cards as admitting membership in the Hang Out Boys gang, under the moniker "Nano." The expert opined, based on a hypothetical, that crimes committed under the circumstances similar to those established at trial would be gang crimes that would benefit the gang.

The jury found defendant guilty of second degree murder, second degree robbery, and assault with a firearm. As to all three counts, the jury found gang enhancements to be true. (§ 186.22.) As to the murder count, the jury found true the allegations that defendant personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (c) and (d). As to the robbery count, the jury found true the allegation that defendant personally used a firearm within the meaning of section 12022.53, subdivision (b). The court sentenced defendant to a total state prison term of 13 years, plus an indeterminate term of 15 years to life, followed by an indeterminate term of 25 years to life.

## DISCUSSION

### I. The People Exercised Reasonable Diligence in Attempting to Secure Dennis's Attendance at Trial

Defendant's sole contention on appeal is that the People failed to exercise reasonable diligence in securing Dennis's attendance at trial. Defendant argues Dennis could not properly be found unavailable and, as a result, defendant's federal and state confrontation rights were violated when the court admitted Dennis's preliminary hearing testimony. We disagree.

## A. Background

*Preliminary Hearing Testimony*

Dennis testified she was close friends with Johnson and Giddens. She initially denied telling the investigating officer anything about the incident. She denied seeing defendant on the night of the incident and denied seeing him shoot anyone that night. She then indicated she saw defendant shoot, but she did not know in which direction. She identified defendant in court as the person she knew by the name "Nano," and the person she saw shooting on the night of the incident.[5] She later testified she saw defendant the night of the incident and he was talking to Giddens. She heard Giddens yell from the alley. She was scared because she heard gunshots. When asked if she could see where the gunshots were coming from she stopped answering questions, saying she was being threatened.[6] She testified her life had been threatened many times because of the case, stating someone "pulled a gun" on her the night of the incident and after. However, she eventually agreed that she wrote a statement accompanying a photographic lineup that included defendant. The statement read: "Number 5, on page B, is Nano. He's the one that shot Ishu . . . at 42nd Street off Broadway."

Dennis admitted she spoke with a detective about what happened to Giddens, and she thought a tape recording was made. In the recording, Dennis told police that she and others, including Bass and Ishu, were sitting around. "Nano" began arguing with "Ishu" and "Ken," and Nano had a gun out. Dennis said Nano started shooting at Ishu in the street at the head of the alley. She explained she could not see Ishu fall: "But I know Ishu ran through the alley. And he was shooting at Ishu because he the only one in the alley." After the recording was played, Dennis testified she recognized her voice on the tape.

---

[5]  Dennis testified she had known Nano for a long time.

[6]  Dennis testified: "I'm being threatened. I see it. I see it. I can't tell you right now. I see it though. I can't do it like that. I can see it. I have feelings."

On cross-examination, Dennis testified she was always at 42nd Street and Broadway because she is homeless.[7] The night of the incident she was drinking half of a half pint of gin. She had used cocaine that evening. Before defendant arrived, Giddens was talking to Johnson. Defendant "probably" appeared to be high. At some point Dennis saw a gun. She refused to answer when asked if she saw defendant shoot anyone. The court found her in contempt of court. Counsel and the court noted Dennis had throughout her testimony looked away from the defense side of the table. When her testimony resumed, Dennis testified Giddens was in the alley, but she denied actually seeing him get shot. She did not see Giddens fall to the ground, but "the proof [was] in the alley." She saw that defendant had a gun in his hand. She saw him take the gun out of his waistband. She described the gun as big, light-colored, with something on it like a piece of tape. The person who did the shooting had a lot of tattoos on his face.

*Efforts to locate Dennis for trial*

On May 28, 2014, nearly six years later, the parties announced ready for trial. On June 19, 2014, the trial court conducted a due diligence hearing. Los Angeles Police Department Detective Eric Spear testified he first interviewed Dennis in 2007. She gave a full statement and made an identification from a photographic lineup, but she was reluctant to participate in the proceedings. Spear transported her to court in 2008 for the preliminary hearing. He picked her up from a homeless shelter on Broadway. Dennis was reluctant, scared, nervous, and upset that Spear "made her" go to court. After Dennis testified, Spear took her back to the shelter. Over the next six years, Spear periodically saw Dennis when he was in the area of 42nd Street and Broadway. Dennis "[was] and [had] been a fixture in that area for many years[.]"

---

[7] She also testified that she had lived in the area of 42nd Street and Broadway since she was 16 years old. She was 61 years old at the time of the preliminary hearing.

Sometime after May 28, 2014, Spear learned the case had been set for trial. Around June 1, Spear began searching for Dennis. He ran searches in D.M.V. records but found only an address he already had for a homeless shelter Dennis was known to frequent. Another detective on the case went to the homeless shelter but Dennis was not there. She had checked out in September 2013 and had not been seen there since. Spear placed a "want" in the "NECS database," so that if law enforcement from another department, city, or agency, stopped Dennis, they would contact Spear immediately. No one contacted him. Spear checked for outstanding warrants; Dennis had a felony no bail warrant for a narcotics violation, but she was not in custody. Spear checked Los Angeles Police Department records to see if Dennis had any contacts with the department. He also checked the records for two county hospitals, County USC and Harbor General. Dennis had not been a patient at either hospital.

Spear checked other local homeless shelters. Dennis had either never checked into these shelters or was not a current resident. He checked with the coroner's office four times. Dennis was not there. The victim advocate office had had no contact with Dennis. Spear checked 42nd Street and Broadway approximately one dozen times without finding Dennis. He also had officers on different shifts check the area for her, including on the weekend. He instructed a police department division that works only with transients to look for her. The division had prior contact with Dennis but had been unable to locate her. The senior lead officer in the area had worked in the location for over 20 years and knew Dennis. He had not seen Dennis in the last two months.

On June 16, Spear spoke with a security guard who worked at 42nd Street and Broadway. The guard was familiar with Dennis but he had last seen her approximately one month earlier. The guard worked at varying times of day. Spear gave the guard a business card and asked him to call Spear's "personal cell phone," if the guard saw Dennis. The guard had not called Spear. Spear also asked Bass about Dennis's whereabouts. Bass had not seen Dennis in one or two months. Spear told Bass to contact him on his personal cell phone if she saw Dennis. He had since asked her approximately five or six times if she had seen Dennis; she had not. Bass told Spear other transients

8

reported Dennis would sometimes hang out at 47th Street and Broadway or 48th Street and Broadway. Spear had not been able to locate her at those locations, despite driving through the area on a daily basis.[8]

On cross-examination, Spear testified he asked Dennis where she was staying after the preliminary hearing. She told him she was staying at the shelter where he dropped her off because she wanted to stop using drugs. Spear did not ask Dennis how long she planned to stay at the shelter or if she had a future anticipated address. He did not ask if she had family members with whom she stayed. Spear knew Dennis was reluctant, nervous and scared to testify, but he did not think she would run and hide.

Although Spear did not ask Dennis for specific information about where she would be staying, he knew that she had been in the 42nd Street and Broadway area continuously since 2007, except when she was in custody. Between 2008 and 2014, Spear saw Dennis three to four times. No other officers made efforts to contact Dennis prior to June 1, 2014. When Spear periodically saw Dennis between 2008 and 2014, he did not ask her where she was staying to establish contact for a future subpoena. Spear explained: "She is homeless. She stays on the street at 42nd and Broadway. That is her home." He testified that prior to June 1st, there was no trial date for which to serve a subpoena, and he had no subpoena to serve.

Spear did not ask anyone he spoke with if they knew whether Dennis had any family members. He did not circulate pictures of her to anyone; the people he spoke with already knew her. He did not run any kind of search that would track Dennis down under an alias. Spear did not ask Bass if, aside from seeing Dennis, Bass had spoken to her.

The trial court ruled the People's efforts were reasonable and Dennis would therefore be deemed unavailable.

---

[8] Spear testified that on June 16, a local transient asked him when the trial would be. Bass was similarly aware the trial was starting. Spear had also seen fresh Hang Out Boys gang tagging in the area of 42nd Street and Broadway in recent weeks.

## B. Discussion

The federal and state Constitutions guarantee defendants the right to confront prosecution witnesses at trial. However, there is an exception when a witness is unavailable and, at a previous court proceeding against the same defendant, the witness gave testimony that was subject to cross-examination. Under federal law, this testimony is admissible if the prosecution made a good faith effort to obtain the witness's presence at trial. Under California law, a witness is unavailable if the prosecution exercised reasonable, or "due diligence," but is unable to procure the witness's attendance by use of court process. (*People v. Fuiava* (2012) 53 Cal.4th 622, 674-675 (*Fuiava*); *People v. Bunyard* (2009) 45 Cal.4th 836, 848-849 (*Bunyard*); Evid. Code, §§ 1291, subd. (a) & 240, subd. (a)(5).)

As our high court explained in *Fuiava,* " 'the term "due diligence" is "incapable of a mechanical definition," but it "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character." [Citations.] Relevant considerations include " 'whether the search was timely begun' " [citation], the importance of the witness's testimony [citation], and whether leads were competently explored [citation].' [Citation.]" (*Fuiava, supra,* 53 Cal.4th at p. 675.)

"[I]n those cases in which courts have not found adequate diligence, the efforts of the prosecutor or defense counsel have been perfunctory or obviously negligent. . . . On the other hand, diligence has been found when the prosecution's efforts are timely, reasonably extensive and carried out over a reasonable period." (*Bunyard, supra,* 45 Cal.4th at pp. 855-856.) " 'Where the record reveals . . . that sustained and substantial good faith efforts were undertaken, the defendant's ability to suggest additional steps (usually. . .with the benefit of hindsight) does not automatically render the prosecution's efforts "unreasonable." [Citations.] The law requires only reasonable efforts, not prescient perfection.' [Citation.] 'That additional efforts might have been made or other lines of inquiry pursued does not affect [a] conclusion [there was due diligence] . . . . It is enough that the People used reasonable efforts to locate the witness.' [Citation.] A court cannot 'properly impose upon the People an obligation to keep "periodic tabs" on every

10

material witness in a criminal case, for the administrative burdens of doing so would be prohibitive. Moreover, it is unclear what effective and reasonable controls the People could impose upon a witness who plans to leave the state, or simply "disappear," long before a trial date is set.' [Citation.]" (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706.)

" 'When, as here, the facts are undisputed, a reviewing court decides the question of due diligence independently, not deferentially. [Citation.]' [Citation.]" (*Fuiava, supra,* 53 Cal.4th at p. 675.)

We conclude the People exercised due diligence in attempting to secure Dennis's attendance at trial. Although Dennis was a reluctant witness at the preliminary hearing, she did appear and testify. In the six intervening years before the trial she remained in a single geographic area. At the time of the preliminary hearing, and for years after, Dennis was homeless but maintained a physical presence around 42nd Street and Broadway. Beginning the search for Dennis over two weeks before the start of trial was not unreasonable. (See *Fuiava, supra,* 53 Cal.4th at pp. 675-676 [detective began looking for witness two weeks before date set for trial; court found this to be a reasonable period].)

In addition, Dennis was one of three eyewitnesses to the shooting of Giddens. Her observations were similar to those of Bass and Davie, whose testimony and statements were presented at trial. The prosecution also had strong evidence in the form of Johnson's statements to police before he died describing the shooter, the ballistics and robbery evidence linking defendant to the crime, and defendant's own jailhouse telephone conversations, in which he discussed the need to find or cause the disappearance of witnesses in the case. We cannot say Dennis's testimony was of critical importance, such that failing to begin searching for her a little over two weeks before the trial was unreasonable. (*Fuiava, supra,* 53 Cal.4th at p. 676.)

Further, efforts to locate Dennis was not cursory or obviously negligent. Spear searched for Dennis at 42nd Street and Broadway and in neighboring areas, and he instructed others to look for her. He searched local homeless shelters, with no results. Spear also searched D.M.V. records, Los Angeles Police Department records, and the

coroner's office. These searches produced no new address for Dennis or clues as to her whereabouts. Spear located a security guard who had seen Dennis one to two months earlier, but not more recently. Spear's request that the security guard contact him upon seeing Dennis was not fruitful. Spear contacted Bass on multiple occasions; she claimed to have no knowledge of Dennis's whereabouts. Spear further enlisted other officers in the search for Dennis, including those familiar with transients and some actually acquainted with Dennis, to no avail. Under the circumstances, these efforts demonstrated reasonable diligence. (See *People v. Wise* (1994) 25 Cal.App.4th 339, 344 [People attempted service at three addresses; investigator contacted post office, local jail, and coroner's office, and could not locate address for witness].)

Indeed, this case is similar to many others in which courts have concluded the People acted with reasonable diligence. For example, in *Fuiava*, the detective began looking for the witness two weeks before the start of trial. He checked her two last known addresses. A neighbor said he had not seen the witness for some time. The detective checked D.M.V. records but found only one outdated address. He went to the address but did not find the witness. He checked hospital and jail records in Los Angeles County on a "pretty regular basis." (*Fuiava, supra,* 53 Cal.4th at p. 676.) He tried to locate the witness's brother. (*Id.* at p. 677.) He gave patrol deputies in the relevant neighborhood a photograph and physical description of the witness, with instructions to contact him if she was spotted, and take her into custody if necessary. The People had no reason to believe the witness would not appear. The *Fuiava* court rejected the argument that the witness's admission at the preliminary hearing that she was fearful of testifying put the prosecution on notice that she might flee or hide instead of testifying. (*Id.* at p. 676.) The court found the People exercised reasonable diligence under the circumstances in attempting to locate the witness. (*Id.* at p. 677.)

Likewise, in *People v. Wilson* (2005) 36 Cal.4th 309 (*Wilson*), the high court concluded the prosecution exercised reasonable diligence based on a detective's efforts over two days. In those two days, the detective visited the witness's last known address,

attempted to locate his known associates, and checked police, county, and state records with 15 names the witness had used. (*Id.* at p. 341.)

The prosecution's efforts in this case were of similar quantity and quality here as those found reasonable in *Fuiava* and *Wilson*, among other cases. Spear began searching for Dennis a reasonable period of time before the trial was set to start, he checked multiple sources for information on Dennis, he repeatedly visited the only place she was known to typically frequent, and he located Dennis's known associate, Bass. Spear had periodically seen Dennis in the intervening years in the same location, suggesting there was no reason to believe she would suddenly relocate. Under the circumstances of this case, the prosecution's efforts were reasonably diligent.

*People v. Cromer* (2001) 24 Cal.4th 889 (*Cromer*), upon which defendant relies, does not mandate a contrary result. In *Cromer*, the witness testified at a preliminary hearing under subpoena, but two weeks later, law enforcement reported she was no longer at the same address. Despite this information, the prosecution made no effort to serve subpoenas to secure the witness's attendance until six months later, only weeks before the trial was set to begin. Investigators went to the witness's house, but she was not there. Eventually, a man at the witness's former home told the investigators the witness was living with her mother in San Bernardino. Two days later they went to the mother's home, and were told the mother would return the following day. An investigator left a subpoena for the witness, but neither returned to speak to the witness's mother, nor attempted to find other ways to contact the mother.

Our high court concluded this was not reasonably diligent, explaining: "Although the prosecution lost contact with [the witness] after the preliminary hearing, and within two weeks had received a report of her disappearance, and although trial was originally scheduled for September 1997, the prosecution made no serious effort to locate her until December 1997. After the case was called for trial on January 20, 1998, the prosecution obtained promising information that [the witness] was living with her mother in San Bernardino, but prosecution investigators waited two days to check out this information. With jury selection under way, an investigator went to [the witness's] mother's residence,

13

where he received information that the mother would return the next day, yet the investigator never bothered to return to speak to [the witness's] mother, the person most likely to know where [the witness] then was. Thus, serious efforts to locate [the witness] were unreasonably delayed, and investigation of promising information was unreasonably curtailed." (*Cromer, supra,* 24 Cal.4th at p. 904.)

In this case, there is no evidence the prosecution knew or had reason to believe Dennis had disappeared, or would disappear, before trial. (See *People v. Martinez* (2007) 154 Cal.App.4th 314, 328 [distinguishing *Cromer* where there was no report shortly after preliminary hearing that witness had disappeared].) For years after the preliminary hearing, Dennis stayed in the same general location. Moreover, "[t]he prosecution is not required 'to keep "periodic tabs" on every material witness in a criminal case . . . .' [Citation.] Also, the prosecution is not required, absent knowledge of a 'substantial risk that [an] important witness would flee,' to 'take adequate preventative measures' to stop the witness from disappearing. [Citations.]" (*Wilson, supra,* 36 Cal.4th at p. 342.)

While the prosecution in *Cromer* had promising leads that it simply failed to pursue, here Spear used several different, logical sources of information to try to locate Dennis. He located and spoke with Bass. He spoke with others who knew Dennis and had seen her relatively recently. He checked local homeless shelters and relevant records. He instructed others, including law enforcement officers, to look for Dennis and to contact him if they saw her. Spear never discovered any promising information, despite reasonable and competent efforts. Defendant faults the People for not getting more contact information from Dennis before she disappeared. Yet, while Dennis was homeless, there was evidence she stayed in a particular location near the scene of the crime, and continued to be seen there for years after the preliminary hearing, even one or two months before the People attempted to locate her. This indicates the People did not have reason to know of a substantial risk Dennis would flee or disappear. (*People v. Friend* (2009) 47 Cal.4th 1, 68-69.) The lack of prosecutorial diligence described in *Cromer* is not present here. The trial court did not err in admitting Dennis's preliminary hearing testimony at trial.

## II.     Any Error Was Harmless Beyond a Reasonable Doubt

Even if the trial court erred in finding Dennis unavailable due to the People's failure to exercise reasonable diligence in attempting to locate her, we would conclude the error was harmless beyond a reasonable doubt. (*People v. Louis* (1986) 42 Cal.3d 969, 993-994.)

Dennis was fully cross-examined at the preliminary hearing. The cross-examination revealed infirmities in her testimony, including that on the night of the incident she was drinking alcohol and had used cocaine. The record also documented Dennis's physical actions and demeanor while testifying. More importantly, Dennis's preliminary hearing testimony was the same in most respects as that of Bass, who testified at trial, and as Davie's statements to police, which were admitted as impeachment evidence once he recanted at trial. Like Dennis, Davie was acquainted with defendant before the incident. On appeal, defendant contends the weaknesses in the Bass and Davie testimony at trial indicate defendant might not have been convicted had Dennis's preliminary hearing testimony not been admitted. Yet, Dennis's prior testimony was as flawed as the trial testimony of Bass and Davie. Dennis's description of the gun defendant used was inconsistent with the gun police recovered. She admitted being under the influence of multiple substances at the time of the incident and her testimony was no more coherent than that of Bass. She initially denied seeing defendant on the night of the incident and she also denied seeing him shoot a gun.

Further, aside from the eyewitness testimony, there was other significant evidence of defendant's guilt, such as Verduzco's identification of defendant; the evidence connecting the weapon found near defendant with the bullet casings found in the alley where Giddens was shot; Johnson's description of a suspect matching defendant's appearance that night; and defendant's consciousness of guilt as illustrated by his jailhouse telephone calls in which he directed others to find, "get at" or "fuck up" the author of a written statement against him, and his agreement that it would be best to make Dennis disappear.

We therefore conclude any error in admitting Dennis's preliminary hearing testimony was harmless beyond a reasonable doubt.

## III.   Abstract of Judgment

Our review of the record indicates the abstract of judgment does not accurately reflect the sentence the trial court imposed.  The abstract reflects that defendant was sentenced to only an indeterminate term of 25 years to life, rather than an indeterminate term of 15 years to life, followed by an indeterminate term of 25 years to life, in addition to the determinate term of 13 years.  The abstract must be corrected to accurately reflect the sentence pronounced in court.  (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1324.)

DISPOSITION

The trial court is ordered to correct the abstract of judgment by modifying it to reflect an indeterminate term of 15 years to life, followed by an indeterminate term of 25 years to life, in addition to the determinate term of 13 years.  The trial court is further ordered to forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


                                        BIGELOW, P.J.

We concur:



            RUBIN, J.



            GRIMES, J.


16